[No. B197737. Second Dist., Div. Three. July 26, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM FRENCH ANDERSON, Defendant and Appellant.

854

**COUNSEL**

Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Susan Sullivan Pithey and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLEIN, P. J.**—William French Anderson appeals the judgment entered following his conviction by jury of continuous sexual abuse of a child under the age of 14 years (continuous sexual abuse) and three counts of lewd act with a child under the age of 14 years (lewd act). (Pen. Code, §§ 288.5, 288, subd. (a).)[1] We reject Anderson's claims of error and affirm the judgment.

## SUMMARY

Viewed in accordance with the usual standard on appeal (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294 [128 Cal.Rptr.3d 417, 256 P.3d 543]), the evidence demonstrated that Anderson, a medical doctor and the founder and director of a genetic research laboratory, sexually molested the daughter of an employee of the laboratory from the time the child was in the fourth or fifth grade until the ninth grade. Anderson coached the victim in competitive karate; she won national karate competitions when she was in the fourth and fifth grades in 1997 and 1998. He also assisted her academically. However, they frequently were alone together and he regularly committed lewd acts upon her. The victim's testimony was generic in that she testified generally about a continuing course of misconduct. E-mails Anderson sent her after the abuse ended but before she decided to report him in April of 2004 corroborated her testimony. Because Anderson indicated in his e-mails he would apologize to her in person, she agreed to meet him outside a public library while carrying a recording device provided by detectives. On July 1, 2004, she surreptitiously recorded a conversation in which she angrily confronted Anderson and asked why he had molested her. At trial, Anderson claimed the apologies in his e-mails were for applying excessive pressure on her to succeed and at the library she was on the verge of going out of control and he was willing to say whatever was necessary to calm her.

On appeal, Anderson contends the trial court erroneously excluded evidence of his conduct after the library confrontation, particularly, that he and his wife wrote a four-page letter to Anderson's friend, San Marino Police Chief Arl Farris, in which they reported the victim falsely had accused Anderson of sexual molestation and expressed their fear she had descended into drug abuse and might try to extort money from them.

No reversible error appears in the exclusion of this evidence as hearsay and under Evidence Code section 352. Also unavailing is Anderson's claim application of these rules of evidence infringed upon his constitutional right to testify in his own behalf. Moreover, any error was harmless as Anderson

---

[1] Subsequent unspecified statutory references are to the Penal Code.

testified fully with respect to all aspects of the case, including the e-mails and the recorded conversation. Evidence related to Anderson's conduct after the library confrontation was not critical to his defense and admission of the evidence would not have altered the outcome of the case.

Anderson also contends he cannot be convicted of continuous sexual abuse in violation of section 288.5 and lewd act in violation of section 288, subdivision (a) based on generic testimony that establishes a single continuous course of conduct. He notes section 288.5 was enacted in 1989 in response to a line of cases that had held generic testimony was insufficient to support a conviction of a lewd act. Further, section 288.5, subdivision (c) permits only one count of continuous sexual abuse per victim and requires that any additional sex offense be charged in the alternative or be alleged to have been committed outside the time period alleged under section 288.5. He reasons lewd act based on generic testimony constitutes a continuous course of conduct offense. Thus, violations of lewd act charged with continuous sexual abuse must be based on specific, rather than generic, testimony.

This claim fails because a violation of section 288, subdivision (a) is not a continuous course of conduct offense even if it is based on generic testimony. Moreover, *People v. Jones* (1990) 51 Cal.3d 294, 320–321 [270 Cal.Rptr. 611, 792 P.2d 643], disapproved the line of cases that had held generic testimony insufficient to support a violation of section 288, subdivision (a). Thus, the distinction Anderson draws between generic and specific testimony is no longer relevant. Because the instant violations of section 288, subdivision (a) were alleged to have occurred outside the time period charged under section 288.5, section 288.5, subdivision (c) was not offended.

Finally, Anderson contends the instruction that permitted the jury to find he committed uncharged offenses offered to prove propensity by a preponderance of the evidence diluted the People's burden of proof as to the charged offenses. He claims this case is distinguishable from other cases that have rejected this contention because one of the uncharged offenses was the first incident of abuse. However, this circumstance does not warrant a departure from the case law that has upheld the instruction.

In sum, Anderson's claims of error fail. Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The People's evidence; Y.'s testimony.*

Y., the victim in this case, and her family emigrated from China to South Pasadena, California, when Y. and her twin sister were in kindergarten.[2] Y.'s mother, Y.Z., M.D., worked for Anderson, the founder and director of Gene Therapy Laboratories (GTL). Y.Z. admired Anderson and impressed upon Y. that Anderson was "this great man." When Y. was nine years old and in third or fourth grade she became interested in karate. Anderson was accomplished in the martial arts. He offered to coach Y. and she began to practice karate with Anderson at his home. With Y.Z., they went to many karate competitions, including the national championships in Florida which Y. won in successive years when she was in fourth and fifth grades. When Y. stopped participating in karate, Anderson coached her in other sports. He took her to practices and games and bought her equipment. He acted as team physician at some of her games. Anderson also helped her with speech and writing and he took her to a speech pathologist.

At first, Y.Z. accompanied Y. to Anderson's home but she stopped and Y. would be alone with Anderson. Anderson's wife was "very rarely" there. Y.Z. trusted Anderson and encouraged Y.'s relationship with him. Y. also believed the relationship with Anderson was positive. However, he began to touch her inappropriately. The first time this happened, Y. was nine or 10 years old and in fourth or fifth grade. Y. was swinging on a punching bag that hung in Anderson's garage. Anderson pushed Y. and his hand "got caught" between her legs "for a pretty long time" and "rubbed [her] vaginal area" over her clothes. Sometime later, Anderson said his hand got caught accidentally but he realized he liked it and he rubbed her.

Y. had difficulty remembering each instance of abuse because she had been trying to forget them. Once, when they were in Florida, Anderson woke Y. by biting her toes, which reminded her that he had advanced to touching her under her clothes. Y. protested but he continued to do it. Y.Z. was present but was "totally oblivious."[3] When returning from local karate tournaments, Anderson and Y. would wrestle in the backseat while Y.Z. drove and Anderson "fleetingly" would touch her private areas.

Y. visited Anderson's home approximately once a week from fourth grade to the end of ninth grade. Anderson molested her throughout this five-year period, although not on every visit. When Y. commenced puberty, Anderson

---

[2] Jury trial commenced June 14, 2006, and ended July 19, 2006. At the time of trial, Y. was 19 years of age.

[3] Y.Z. testified she did not remember the incident.

said he needed to check her growth and development. On several occasions, he weighed and measured her naked in his bathroom. He also inspected and occasionally licked her vaginal area. Anderson molested her more frequently during the summers preceding seventh and eighth grades because she spent more time with him. Other than Anderson's abuse, Y. had fun at Anderson's house and enjoyed spending time with him. The molestation occurred less frequently as Y. got older because she began to resist.

Initially, the abuse consisted primarily of vaginal rubbing and licking. As Y. began to insist that her underwear remain on, Anderson began sucking her breasts and thrusting his penis against her vaginal area. Y. avoided looking at Anderson's penis but could feel his erection and knew he ejaculated because her underwear would get wet. Y. often read comic books while Anderson touched her to distance herself from what he was doing. Anderson told Y. he loved her and the sex acts would boost her self-esteem. More than once Anderson told Y. if they were ever caught she should say it was the first time, it was all her idea and she had finally convinced him to do it.

The abuse occurred at least once a month except when Y. went to summer school or Anderson took a vacation. These gaps did not occur more than once or twice. Toward the end of the five-year period, the abuse became more scheduled. Y. would say she did not feel well or had her period, but Anderson would become increasingly aggressive until "in the end it was just easier just to let him do it, then it would be fine again" for about three weeks.

Y. did not mention the abuse to her father, who was raised in China and was very strict. Y.'s father used physical discipline but Y. did not consider it abuse because it is normal in the Chinese culture.

Anderson frequently took Y. to dinner alone and he once let her drive his car on the freeway. Y. knew Anderson had connections with law enforcement. He had a high-level black belt, he helped train police officers to fight and he carried a police badge. During the abuse, Y. did not want to report Anderson because he was well respected and she thought he did not understand the extent to which he had hurt her. Also, Y. believed her mother would be devastated and Y.'s whole life would be "opened up and torn apart." When Y. was younger, she was confused about the abuse. As she got older, she "increasingly felt like a slut." In middle school, Y. began cutting herself as a coping mechanism. She continued to cut herself in high school.[4]

Toward the end of her ninth grade school year, Y. had two conversations with Anderson about stopping the abuse, both of which took place in his car.

---

[4] When Y.Z. told Anderson she was considering sending Y. to a therapist because she was cutting herself, Anderson said Y. would "shut out the therapist" and told Y.Z. to send Y. to him.

In the first conversation, Y. told Anderson she "just really did not want it . . . ." Anderson was shocked and said "he couldn't be [Y.'s] friend if he didn't know that sometime in the future that could happen again." After this conversation, Anderson asked several times if she were "ready to do it again." Finally, Y. said, "I'm not okay with doing anything, and I won't ever be okay." She also told Anderson it felt like rape. Anderson cried and said he did not know why she felt that way.

Y. testified the secret of the abuse caused her to become depressed. In the second half of 10th grade, the spring of 2003, she spoke to Janet Waldron, a school counselor, to get help with her depression. Y. did not want the abuse reported and told Waldron a friend of hers had been abused. Eventually, Y. admitted she had been abused by her mother's boss, but she minimized it. Waldron, a mandated reporter, filed a report of Y.'s statements on July 5, 2003. Soon thereafter, City of South Pasadena police officers came to Y.'s home. Y. went outside to speak to the officers because she did not want her parents to hear the conversation. At that point, she had only told her friend, A.L., about the abuse.[5] Y. cried during the interview and minimized the abuse even more than she had with Waldron.[6]

A few days later, Y. and her family went to a meeting at the San Marino Police Department. Y. had not spoken to her parents about the abuse. En route to the meeting, Y. said she did not want to go and did not want the investigation to continue. Y. told the San Marino police officers who interviewed her nothing had happened.

Y. continued to communicate with Anderson and planned a trip for her 16th birthday with him through e-mails. In July of 2003, Y., her sister, Anderson and his wife went on a kayaking/hot air ballooning trip. Y. and Anderson planned a second similar trip with Y.'s friend. However, Anderson cancelled the second trip because he feared liability if Y.'s friend were injured. Y. was angry because she felt it was hypocritical of Anderson to worry about liability with respect to her friend when he had been doing illegal things to her.

In the summer of 2003, Y. took classes to prepare to take calls for Teen Line, a hotline for teenagers. As part of her training, Y. learned child molesters generally are repeat offenders.

---

[5] A.L. testified Y. told her, in the spring of 2002, that Anderson had molested her but did not provide details. Y. said the molestation occurred in Anderson's car.

[6] When Y. went outside to speak to the officers, Y.Z. telephoned Anderson, who said he did not know anything and asked Y.Z. to call when she learned what was happening. The officers showed Y.'s parents a report reflecting the counselor's suspicion Anderson had molested Y. Anderson telephoned and e-mailed Y.Z. but she did not tell him about the report. Y.Z. continued to work for Anderson but found it difficult.

In August and September of 2003, Anderson was still e-mailing Y., talking about his vacation, offering to buy her sports equipment and declaring his love for her.

If Y. wrote Anderson an e-mail that took effort, she would save a draft before she sent it to avoid having to write the e-mail again. One e-mail she sent to Anderson asked: "Do you even admit that you did hurt me totally with your sexual acts upon me[?] Then why did you say that you wouldn't be able to stand it if you didn't have some sort of hope that I would let you do those things again[?]" "And then when I told you that it felt like rape, why did you again bring up the stupid topic and say that you needed to have hope that I would be able to do it again. What the hell is wrong with you[?] . . . I'm tired of being hesitant and unsure and pliable. . . . I told you it felt like rape and I meant it. [¶] . . . It took almost every ounce of strength in me to say so and you underestimate everything. I don't care how you interpret this as long as I get answers and ones that make sense."[7]

Anderson replied: "I want to apologize to you from the bottom of my heart for the thoughtless things I did and said. I cannot justify or explain why I behaved so badly. I totally accept that you no longer want to be friends. . . . If you will let me, I would like to apologize to you in person. But if you do not want to ever see me, that is okay."

Y. replied to that e-mail, and Anderson responded: "I have thought a great deal about my actions. . . . I finally came to the sad conclusion that there must be a very bad part of me that, now that I have recognized it, has to be permanently suppressed. I can never allow that part of me to ever surface again. . . . As for the stupid stupid statements about the future: since the day on the road when you made clear to me how badly I treated you, I have never had any intention of behaving that way again. . . . To even hint that the future might have been more of the same revealed a thoughtlessness and insensitivity that boggles the mind. I just cannot understand how I could have been so awful. But that awful aspect was there and I have to deal with it by making certain that nothing like it ever happens again, and doing whatever I can for the rest of my life to help you (and to help you directly if you ever again should want my help). [¶] I have wanted to see you for several months in order to talk with you directly and to acknowledge how badly I treated you, but now that we are communicating I think that I am too ashamed to see you

---

[7] When Y. testified about this e-mail, the trial court instructed the jury the content of the e-mail was not being received for the truth of the statements it contained. Rather, if the jury determined the e-mail was "created, sent and received," it could consider the e-mail only for the limited purpose of supplying meaning to any response Anderson may have made to it. The trial court repeated this instruction at several points during Y.'s testimony regarding the e-mails and gave a similar instruction with respect to her statements in the library confrontation.

right now. I will if you want, of course, but I think that I need to keep working on making myself into a different person first."

Y. again responded and Anderson replied: "How far am I willing to go to help you? I will do whatever you want, for as long as you want, in any way that you want, so long as no one else is hurt. . . . I believe that I have to earn your trust again before I can ever ask you to accept my apology. Although I am embarrassed to meet you face-to-face, I think I just have to make myself do it."

Y.'s response to that e-mail requested an apology. Anderson replied with an e-mail that started: "Concept for a novel. Plot: Extortion of a famous biotech scientist either for money or to acquire bioterrorism expertise. . . . An exchange." In the e-mail, Anderson indicated he would apologize if they were speaking "face-to-face" but "emails are not safe. . . . And what would someone do with such an . . . explicit email from a famous person confessing to something terrible? Sell it, or extort money for it. . . . The confessions of a world famous scientist would easily bring . . . $100,000 from a tabloid that would publish them on page 1 with lurid headlines and lots of pictures of all parties involved. . . . The result would destroy your life and my life. I have often wondered what could drive anybody to actually take their own life. I have always felt that there is always hope. But if I saw you and your family destroyed, and my whole career down the tubes, and all the thousands of people abandoned who would have been helped by the cures that your mother and I are developing, then I can understand what would drive a person to suicide. For me, a powerful 9 mm bullet through the head would be the way to go. . . . Just in case, I have bought the ammunition."

In response, Y. asked what Anderson would do if she "wanted to report." In a subsequent e-mail, Y. stated Anderson had ruined her life. She indicated she was scared and asked: "Why have I not reported you[?] . . . Your life is still fine but mine is cracking slowly and perhaps I may fix it but because of your actions[,] I face a hypocritical life or at least one in which I lie a lot. I don't have much to lose by reporting do I[?] It is you who [has] so much to lose. And it is the people who trust in you who have so much to lose. . . . You have not ever proved to me of your true innocence and memories to the contrary flash before me. . . . I suggest you go to therapy. No. I demand it. . . . It will give me a meager feeling of closure but it is better than none."

In an e-mail dated December 9, 2003, Anderson agreed to attend therapy, writing, "Although this is, of course, terribly embarrassing, I am very relieved to finally be getting professional help. Thank you for making me do it."

Y. requested progress reports from Anderson regarding the therapy. On December 21, 2003, Anderson e-mailed Y.: "I am undergoing what is called cognitive behavioral therapy. . . . It will take a while, but I think that the therapy will help me pull myself back to some level of self-worth." On December 22, 2003, Anderson e-mailed: "The bad part has been permanently buried. I understand that you want nothing to do with me so that if by chance we run into each other, I will respect your feeling[s] and not look at you or try to say anything. . . . My hope . . . is that someday you may forgive me and we can be friends."

In February of 2004, Anderson e-mailed he was now working on his two "most important goals." The first was to help Y.Z. obtain grants and a tenured position which "would give her and her family long-term financial stability." The e-mail continued: "The other issue is you. In discussions about you (never by name)[,] . . . [t]he only question is what you want and what you feel is best for you. There are two directions that you could decide to go. One is that I never again have any role in your life. . . . The other direction to go, if you wanted, would be to try to reinitiate a relationship. . . . All this is up to you. But I am willing to try to do anything that you might want."

Y. did not want contact with Anderson other than receiving progress reports to prove he was in therapy. When Anderson e-mailed about other topics, Y. wrote, "Just send me progress reports." Thereafter, on February 18, 2004, Anderson requested permission to attend one of Y.'s sports events as follows: "I know the answer is probably no, but I had to ask. I would park in the back . . . , arrive[] just at the start, go up into the stands on the far right side and sit by myself, never approach the field or make any contact, and leave right at the end without talking to anybody. I would only come if you specifically say okay. . . . I did not want to miss the opportunity to watch you at least once this year, if you might allow me to be there."

In April of 2004, Y. decided to report the abuse. Because Anderson was respected and had contacts with law enforcement, Y. and her mother found a lawyer to help them. They went to the sheriff's department and, on May 27, 2004, Y. discussed the molestation in as much detail as she could remember with a social worker.

Y. thereafter agreed to confront Anderson while carrying a recording device. In an e-mail, Y. requested a meeting with Anderson at the South Pasadena Public Library. One of Anderson's responsive e-mails stated: "Obviously our meeting is very important and I will arrange my Thursday around you. . . . I will be there whenever you say."

On July 1, 2004, sheriff's detectives provided Y. a recorder and, at 1:30 p.m., Y. met Anderson in front of the library with the device in her purse. The following conversation was recorded:

"[Anderson]: Uh . . . can we go somewhere?

"Y.: Why?

"[Anderson]: Because I think I'm going to break down (INAUDIBLE) . . . [¶] . . .

"[Anderson]: I'm sorry. I'm sorry.

"Y.: Is that all you have to say?

"[Anderson]: [Y.], I told you, and it's true, that I will love you forever. To hurt somebody, to damage somebody you love is the worst thing you can do . . . . [¶] . . . [¶]

"Y.: I don't—why did you do it?

"[Anderson]: I don't know. . . . [¶] . . . [¶]

"Y.: For like how many years?

"[Anderson]: I know.

"Y.: How many years? . . . [¶] . . . [¶]

"[Anderson]: Several. I know. . . . [¶] . . . [¶]

"Y.: When I wanted you to stop, you still kept going.

"[Anderson]: I know.

"Y.: Why?

"[Anderson]: I don't know. It was so unbelievably (INAUDIBLE)—

"Y.: Because you know what?

"[Anderson]:—so stupid. . . . [¶] . . . [¶]

"Y.: (INAUDIBLE). I'm 17 and I still haven't gotten a boyfriend. Why? Why? Did you do it to anybody else?

"[Anderson]: No. That's why I can't comprehend it. I've never done anything like that to anybody ever. I've been—

"Y.: I can't hear you. Why are you—Goddamn, I can't hear you.

"[Anderson]: Okay. I'm sorry. I'll talk louder.

"Y.: Goddamn it, you're like whining.

"[Anderson]: Well, yes, because I'm—I mean, I just—I—I'm sorry and I don't know—I don't know how to—how to say it.

"Y.: What are you sorry for?

"[Anderson]: I'm sorry for damaging you. That's what I'm sorry about.

"Y.: 'Damaging.' That's such a stupid word, 'damaging.'

"[Anderson]: Well, hurt you. Just to have been so thoughtless, to have been so—so—so—I just don't know.

"Y.: Well, I hurt, okay? And it's gotten worse. As I grow older, it's worse. I go to sleepovers and we talk and we're girls and stuff. And you know what? I can't. [A]nd I can't—I don't know what to do. Why did you do it?

"[Anderson]: I don't know.

"Y.: Goddamn it. How the hell do you feel sorry? So much. Okay, look at my arm. Okay? I keep doing this. I just keep fucking doing this. And you have nothing to say. You're not saying anything.

"[Anderson]: I'm sorry, [Y.]

"Y.: That's all you can—all you ever said is 'sorry, for damaging me.' That's it. That's all you can say?

"[Anderson]: I would say anything I could, but I—I don't know—I don't know what to say. I can not explain why I ever did anything. I can't—I just—

"Y.: When I was like in, what, fifth grade? Why did you do it when I was in like fifth grade? That's like elementary school. In fifth fucking grade?

Why? And then like—in like middle school and then like—I don't know. I don't know what you fucking did, like—you fucking checked my weight and stuff. I don't get it. Why did you do that, too?

"[Anderson]: Well, what I thought [I] was doing was—was seeing how fast you were growing, how big you were getting—

"Y.: When I was naked? Huh? . . . [¶] . . . [¶]

"[Anderson]: I know it doesn't make sense at all. (INAUDIBLE). It doesn't make any sense at all. I just did it—just something in me was something just evil.

"Y.: . . . You're not saying anything though. It's not making it better or anything.

"[Anderson]: I know, [Y.], I just—what—what—what can I say? I mean—I mean—I mean, I did a horrible thing.

"Y.: You're not talking—

"[Anderson]: I ruined your life. I mean, what can—what can I do?

"Y.: Why did you hit on somebody else? . . . [¶] . . . [¶]

"[Anderson]: I didn't hit on anybody else.

"Y.: I heard you did. . . . [¶] . . . [¶]

"[Anderson]: I've never had a—except for you, I've never done any-thing that wasn't, you know, perfectly noble. I mean, that's why it's so incomprehensible. . . .

"Y.: You did something to me.

"[Anderson]: Oh, I certainly did. I certainly did. And I—I just—don't understand why I did it.

"Y.: Why did you molest me? Why? Why me? Why the fuck? Huh?

"[Anderson]: I don't know. I know initially I had this stupid idea that this would help you. I know it sounds ridiculously stupid, but—

"Y.: What, touching would help me?

"[Anderson]: I know.

"Y.: Yeah?

"[Anderson]: I know. I know. But that was—I had this thought that you had low self-esteem and so—and it's stupid. It's—it's—it's indefensible.

"Y.: What?

"[Anderson]: It's indefensible. I can't—I can't explain it. It's just—it's just evil.

"Y.: I can't—I hurt.

"[Anderson]: I know.

"Y.: And I don't know how to get fucking rid of it. (INAUDIBLE) and I try cutting myself . . . I keep saying . . . and I do . . . and it still hurts. And I hurt so much I can't even feel the fucking pain. (INAUDIBLE) . . . fucking . . . Is that all you're going to say is you're sorry? . . . [¶] . . . [¶]

"Y.: Because I expected more. I expected something.

"[Anderson]: [W]hat—I will say I will do anything you want.

"Y.: Anything?

"[Anderson]: Yes. . . . [¶] . . . [¶]

"[Anderson]: I don't know what to do (INAUDIBLE) the guilt I feel, I'm going to have forever. I'm just—I'm going to have it every single day.

"Y.: Are you guilty enough to turn yourself in, huh?

"[Anderson]: I—I talked with the therapist about that and basically he said that would damage so many people that it would be—that—

"Y.: Why?

"[Anderson]:—that—that—that is not something I could do.

"Y.: Who will it damage? Who will it damage?

"[Anderson]: All the people that—well, basically, you know, I would be arrested and go to jail; my lab would shut down; people would lose their jobs; all the people who ironically look up to me as a model of the right way to live, people in Oklahoma—

"Y.: Shouldn't they know the truth though? Shouldn't they?

"[Anderson]: If—if that would really help you, for it to be public, then I—then I think I would do it."

### 2. *Defense evidence.*

#### a. *Anderson's testimony.*

Anderson testified he attended Harvard University, and Cambridge University in England where he met his wife. He worked at the National Institutes of Health until 1992 when he moved to Los Angeles and founded GTL. He also is a tenured professor in biochemistry and pediatrics at the University of Southern California. Y.Z. was the third or fourth person Anderson hired at GTL. Y.Z. rose to the top of the management chart at GTL and was director of research.

In 1995, Y.Z. asked Anderson to recommend a karate school for Y. Y.Z. later became concerned that Y. was antisocial and asked Anderson to work with Y. in martial arts. Thereafter, Anderson trained Y. to fight competitively in his home on Saturdays for two years. His wife usually was home. Y.Z. drove them to local competitions and had a key to the Andersons' home. They went to Florida to compete in tournaments in 1997 and 1998. Y. said it was the happiest time of her life.

During breaks from training, Y. sometimes would swing on the heavy bag and Anderson occasionally would push her. However, the punching bag incident Y. described never occurred.

In February of 1998, social services investigated Y.Z.'s husband. Y.Z. told Anderson the girls were going to be removed from her care because they had been spanked. Anderson attended a meeting at a county office regarding this matter. After the meeting, Y. convinced a counselor any problem had been resolved. Y. was very pleased she had taken care of "the bad home situation." Y.Z. thereafter asked Anderson to take a broader interest in Y. and "be more of a mentor for her."

When Y. stopped participating in karate, Anderson practiced other sports with her. He wrote letters of recommendation to Teen Line for Y. and her sister. In 2003, Anderson let Y. drive his car in his driveway but never on the freeway.

Anderson admitted he pressured Y. to succeed. At the end of Y.'s eighth grade school year, she started to become adamant that Anderson was pushing her too hard. In February of 2003, Y. told Anderson, "I don't want you to take this wrong, but this feels like rape." Anderson claimed Y. "poured out all these things that she said I was doing to her and pressuring her." He "determined that with the word rape having been used," he would never be alone with Y. again at his house.

On March 13, 2003, GTL lost its funding. Many employees had to be laid off and Y.Z.'s pay was cut. In June of 2003, Y.Z. was pressuring Anderson for a raise and a promotion to deputy director of the lab, which would have put her in line to be the director.

When Anderson cancelled the second trip, Y. terminated all contact with him. Anderson denied receiving any of the e-mails Y. assertedly had saved as drafts. He claimed that, on November 20, 2003, Y. sent him a short e-mail, which was not in evidence, in which she said he had ruined her life by pressuring her scholastically and in sports. The last line of the e-mail said, "and you sexually abused me." Anderson showed the e-mail to his wife, then telephoned Y. and asked why she falsely had accused him. Y. said she wanted to get his attention after not communicating with him for five months. She said she was crashing, she felt bad about letting him down and blamed him for pressuring her.

In subsequent e-mails, also not in evidence, Y. asked Anderson to apologize for his "overzealous pressure causing her to crash and ruin her life." He claimed another of her e-mails not in evidence stated, "No, you didn't sexually abuse me, but you certainly emotionally abused me." Anderson testified the e-mail which mentioned "flashes of memory of sexual abuse," "set off alarm bells." In response, Anderson sent Y. the "plot of a novel" e-mail to shock her.

Anderson claimed he agreed to attend therapy to address stress caused by GTL's loss of funding. He consulted a therapist and learned about cognitive therapy, which he explained to Y. Anderson admitted he wanted Y. to believe he was in ongoing therapy, even though he attended only one session, and he wrote progress reports to placate her. The apologies in his e-mails were for his overzealous pressure.

When Y. asked to meet Anderson at the library, she was happy and Anderson expected a cheerful reunion but she glared at him with "utter hatred," pointed at him and showed him "fresh cuts." Anderson testified Y. was on the verge of going out of control and there were many people in the area. Anderson did not know what to say so he kept apologizing. "I was

doing whatever I had to do to keep her calm and get out of there . . . ." Anderson testified a 19-second pause in the conversation was uncomfortable but, "I didn't dare just turn around and leave."

Anderson claimed he did not respond to Y.'s allegation he had weighed her naked and he was "stunned she would say something like that." When Y. said he had ruined her life, he thought she was talking about pressuring her in sports and school. Anderson testified he thought to "hit on" meant to ask for money. When Y. accused Anderson of sexual abuse, Anderson did not respond for quite a while, trying to think of a response. Anderson had been saying everything he could, "I'm horrible, this is indefensible, I'm evil," to calm Y. but she was getting worse.

When Y. asked if Anderson would turn himself in, her demeanor changed from cursing and quivering to cool and calm. At that point, Anderson decided Y. wanted to hear him say he would be arrested and go to jail, so he said it. Anderson also said he would go public, which meant he would talk to her parents or whomever she wanted. "I had to say something to satisfy her, to get out of there. I thought that would satisfy her . . . ."

At the end of the recorded conversation, Anderson offered Y. a ride. Anderson testified this illustrates how confused he was. Anderson stayed at the library for a few minutes trying to comprehend what had just happened, then went home and talked to his wife for quite a long time. Anderson testified, "Somebody I worked very hard to help turned on me and tricked me into saying damaging statements."

On cross-examination, Anderson testified that when Y. asked, "when I was naked?," Anderson shook his head no. Anderson acknowledged his response as reflected in the recorded conversation "doesn't make sense at all," but claimed he was referring to what he thought the conversation was about, putting pressure on her. Anderson's statement, "I just did it," refers to another part of the conversation, not weighing her naked. "I did a horrible thing," also is not about weighing Y. naked. When Y. asked why he had molested her, there was a pause and he said nothing. Then, Anderson finally said, "I don't know," because he did not know what to say. In response to a question from the prosecutor, Anderson indicated his IQ is 178.

b. *The testimony of Anderson's wife.*

Kathryn Anderson, M.D., Anderson's wife, corroborated many aspects of Anderson's testimony. She testified she usually was home during Y.'s visits, although she did not always interact with her. Y.Z. and her daughters frequently visited and she spent time with Y.Z. at the home on a regular basis.

In March of 2003, Y.Z. was angry after GTL lost its funding. Y.Z. shouted at Anderson during their conversations but Anderson refused to engage in conflicts with anyone. After March of 2003, Y.Z. became much less friendly and Y. was not a frequent visitor to the home.

She encouraged Anderson to meet Y. at the library because they had been trying to get help for her. She testified Y. "was disturbed before we met her. She was very troubled during the period of time that we, [Anderson] particularly, were mentoring her, and she had obviously been very disturbed in the fall around Thanksgiving." When Anderson returned from the library meeting, he was "ashen, and he was literally shaking."

### c. *Other evidence.*

Lena Basile shared an office at GTL with Y.Z. When GTL lost its funding, Y.Z. was devastated. Y.Z. began to criticize Anderson's science and said he had received too much credit for GTL. Y.Z. falsely accused Basile and her partners of many serious things. Basile testified Y.Z. would "lie about anything to suit her own aims."

Numerous witnesses described Anderson as nonconfrontational and testified he had a professional and social reputation for honesty.

### 3. *Summary of the parties' argument to the jury.*

### a. *The prosecution.*

The prosecutor argued Y.'s testimony was corroborated by Anderson's e-mails, the recorded conversation and Anderson's testimony. Also, although Anderson testified he never received the e-mails Y. saved as drafts, his e-mails respond directly to what she wrote, proving "this is exactly the victim and the defendant talking to each other . . . ." The prosecutor noted Anderson admitted he was attempting to manipulate Y. in his e-mails and argued: "He need[ed] to control her. He desperately need[ed] to keep her quiet, desperately need[ed] to keep his dirty secret."

The prosecutor described Anderson's conduct after Y. terminated their sexual relationship as that of "a man who is obsessed with his lover." The prosecutor referred to the recorded conversation as a "taped confession" in which Anderson admitted "in clear language that he molested her." When Y. asked Anderson why he weighed her when she was in middle school, Anderson said he was "seeing how fast you were growing." Thus, although Anderson denied at trial that he ever weighed Y., in the recorded conversation he admitted he did.

The prosecutor claimed Anderson did not leave the library confrontation because he was "desperate . . . to control her and to continue to have that secret kept secret." Although Anderson testified he just wanted to leave, "we know that the reason he didn't want to walk away is because he wanted to continue to control her, try to appease her, tell her he is sorry and hope she would not go to the police. He could not afford her going to the police."

### b. *The defense.*

Defense counsel argued, "Everything that she does can be explained by a troubled young woman who decided at some point the way to have friend[s] was to be a victim. And gradually, as she spun her various versions of this, tried it out on various people, that is what happened. Her life changed." She did not want to go to court "but events and activities . . . caught up with her, and that is what we are doing here in court today."

Defense counsel asserted Y.'s testimony was not credible, noting she told A.L. she was molested in a car. Y. also gave conflicting reports as to the duration of the abuse, she claimed she was molested for more than five years but she never saw Anderson's penis and she manipulated the system to terminate the dependency investigation of her father. Also, her father's physical abuse could have caused the cutting behavior. When she told Waldron about the abuse, she was continuing to socialize with Anderson.

Regarding the library confrontation, defense counsel argued Anderson was confronted by a "damaged" person who had been complaining about the pressure he put on her to do well. "[H]e is trying not to make the situation worse."

### 4. *Verdicts and sentencing.*

Anderson was convicted of continuous sexual abuse in violation of section 288.5 between March 1, 1999, and September 30, 1999, and three counts of lewd act in violation of section 288, subdivision (a) committed between October 1, 1999, and December 31, 1999, between January 1, 2000, and December 31, 2000, and between January 1, 2001, and December 31, 2001, respectively.

The trial court sentenced Anderson to 14 years in state prison, consisting of the middle term of 12 years for continuous sexual abuse and a consecutive term of two years for one of the counts of lewd act.

## DISCUSSION

1. *The trial court committed no reversible error in excluding evidence of Anderson's conduct after the library confrontation.*

 a. *The letter to Chief Farris and Anderson's cooperation with authorities.*

After the library confrontation on July 1, 2004, Anderson went home and spoke to his wife. Together, they wrote a four-page letter to Anderson's friend, San Marino Police Chief Arl Farris, dated July 4, 2004, "to obtain advice" about "a very disturbing meeting that took place between . . . the 17-year-old daughter of our friend, Dr. [Y.Z.] . . . and [Anderson] on the front lawn of the South Pasadena Library . . . ."

The letter summarized the history of Anderson's relationship with Y. and her family and described the November 2003 e-mail in which Y. accused Anderson of sexual molestation as an "aberrant event" that occurred after no communication with Y. for the previous five months. The Andersons asserted the November 2003 e-mail "was full of sociological jargon (apparently learned at Teen Line) and stated that [Y.] wanted [Anderson] to communicate with her because he had sexually abused her as a child and she wanted an apology. [Anderson] immediately called her and demanded to know why she had falsely accused him of sexual abuse. She agreed the claim was groundless, but said that she was trying to get his attention."

The Andersons wrote they believed Y. was deeply "disturbed to be making such false accusations." However, "occasional emails over the winter and spring suggested that she was doing better and, therefore, the call on June 30 for a meeting on July 1 came as no surprise. . . . [W]e had no idea that [Y.'s] life had spun out-of-control."

Regarding the library confrontation, the letter stated Y. met Anderson's greeting with a glare and said, " 'You ruined my life!' . . . Whereupon she related how she had nearly flunked out of school, . . . was seeing a therapist, was on several anti-depression drugs that, she said, were doing no good, was unable to control her emotions, was cutting herself with razor blades, and found her life growing increasingly out of control. . . . All [Anderson] could do was apologize for any problem we had caused her, but said that there was nothing helpful he could think of to say. . . . Then she made the strange statement: 'I hear that you have been hitting on other people.' It is true that [Anderson's] laboratory has gone through a major budget cut, but our personal finances are fine so that we have no idea why [Y.] would make such a statement. She then asked again for help. [Anderson] said he would do

whatever he could to help her, but did not know what else to say. [Y.] said that [Anderson] was no help and that she had to go, and left. . . . [Anderson] was absolutely stunned at [Y.]'s ferocity, and was very frightened for her. . . . We were both caught totally unaware by her disturbed appearance and behavior."

The letter closed as follows: "Our concern is that [Y.]'s bizarre statement about 'hitting on' people might have been an indication that she is thinking about hitting on us. If she has also descended into street drug use, then she may need money. What if [Y.] says that she will destroy our reputations by telling her school that she was sexually abused by [Anderson] unless we give her money? How do we protect ourselves from an extortion attempt? What should we do?"

Anderson delivered the letter to Chief Farris on July 6, 2004. Chief Farris felt he had a conflict of interest because of Anderson's contacts with the San Marino Police Department and referred the matter to the Los Angeles County Sheriff's Department, which already was investigating Y.'s allegations.

On July 9, 2004, deputy sheriffs interviewed Anderson at his home and Anderson gave the deputies copies of e-mails. After service of a search warrant at his home on July 30, 2004, a detective secretly recorded a 45-minute interview with Anderson and then arrested him.

> b. *Legal proceedings below.*

The People filed a pretrial motion asking the trial court to exclude evidence of the letter to Chief Farris as hearsay. The defense sought admission of the letter for nonhearsay purposes, under exceptions to the hearsay rule, to impeach the statements Anderson made during the library confrontation under Evidence Code section 1202 and as circumstantial evidence of his innocence.

The trial court ruled the letter was inadmissible hearsay, finding it did "not satisfy the trustworthiness component." The trial court stated: "There is way too much potential for fabrication, for motivation, for covering oneself, for any number of factors aside from the fact that it may be true." The trial court also determined the letter was inadmissible under Evidence Code section 1202, and it was substantially more prejudicial than probative under Evidence Code section 352. The trial court indicated it would reconsider its ruling if Anderson testified.

During trial, the defense renewed its request to present evidence of Anderson's conduct after the library confrontation. The trial court again ruled the content of the letter constituted hearsay and did not fall within any

exception. The trial court found the fact the letter had been written and the subsequent actions taken by Anderson were irrelevant and inadmissible under Evidence Code section 352. The trial court ruled: "This is the type of evidence that just leads nowhere except to confusion, speculation, sur[m]ise and supposition. It confounds the jury and diverts and distracts their attention."

After Anderson testified about the library meeting, the defense argued Anderson should be permitted to testify about "what he did . . . after this." The trial court found Anderson's statements to law enforcement inadmissible, stating: "They certainly do not fulfill the requirements of any so-called prior consistent statements under Evidence Code Sections 791 and 1236 because of the timing of any such statements and the very real motive or opportunity to fabricate."[8]

The trial court also found the evidence was "substantially more prejudicial than probative. I have evaluated it. It is confusing. It opens up all sorts of issues which I do not think should be opened up and is, in essence, an end run around the hearsay rule in much the same way that absence of flight is an end run around the flight instruction under . . . *People* [*v.*] *Williams* [(1997) 55 Cal.App.4th 648, 651 [64 Cal.Rptr.2d 203]]." The trial court ruled the proffered evidence "causes the jury to be distracted from the real issues in this case. If the content were admissible, it would be different. The content is inadmissible and the actions, therefore, are inadmissible as well, as I weigh and balance and evaluate them under 352 of the Evidence Code." The trial court indicated it had considered Anderson's requests on federal and state grounds.

c. *Anderson's contentions.*

Anderson contends (1) the letter to Chief Farris was not hearsay as it was not offered for the truth of the matter asserted and the hearsay rule was inapplicable because Anderson testified and was subject to cross-examination; (2) the trial court's ruling under Evidence Code section 352 was inadequate; (3) the trial court applied evidentiary rules in a manner that was arbitrary and disproportionate to the state's legitimate interests, thereby denying him the

---

[8] Evidence Code section 791 provides: "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] . . . [¶] (b) An express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Evidence Code section 1236 provides: "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791."

right to testify in his own words and to present critical defense evidence; (4) Anderson's conduct after the library confrontation was admissible as part of his adoptive admissions in response to Y.'s accusations during the library confrontation; (5) the content of the letter to Chief Farris was admissible under Evidence Code section 1202 to attack Anderson's credibility as a hearsay declarant; and (6) in addition to the infringement of Anderson's right to testify in his own defense, the exclusion of the proffered evidence requires reversal because the prosecutor took unfair advantage of the trial court's ruling in argument to the jury.

We address these contentions below.

### d. Letter to Chief Farris properly excluded as hearsay.

" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) "Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subd. (b).)

"Hearsay is generally excluded because the out-of-court declarant is not under oath and cannot be cross-examined to test perception, memory, clarity of expression, and veracity, and because the jury (or other trier of fact) is unable to observe the declarant's demeanor. [Citations.] Because the rule excluding hearsay is based on these particular difficulties in assessing the credibility of statements made outside the jury's presence, the focus of the rule's several exceptions is also on the reliability of the out-of-court declaration. Thus, the various hearsay exceptions generally reflect situations in which circumstances affording some assurance of trustworthiness compensate for the absence of the oath, cross-examination, and jury observation. [Citation.]" (*People v. Cudjo* (1993) 6 Cal.4th 585, 608 [25 Cal.Rptr.2d 390, 863 P.2d 635], citing *Chambers v. Mississippi* (1973) 410 U.S. 284, 298 [35 L.Ed.2d 297, 93 S.Ct. 1038].)

Anderson asserts the letter to Chief Farris was not offered for the truth but to show that he delivered the letter to the police and invited an investigation of his relationship with Y. However, unless the content of the letter is considered, the fact Anderson and his wife wrote a letter which Anderson thereafter delivered to Chief Farris was meaningless. Anderson also claims the letter was admissible to show his state of mind and to provide circumstantial support for his claim he was alarmed by Y.'s behavior and it caused him to fear extortion. However, Anderson's state of mind days after the library confrontation was marginally relevant and the trial court did not prevent Anderson from testifying about his perception of Y.'s behavior during the library confrontation.

Anderson further claims the trial court erroneously compared his conduct after the library confrontation to the absence of flight, citing *People v. Williams, supra*, 55 Cal.App.4th 648, which held "the absence of flight" is " 'so laden with conflicting interpretations, that its probative value on the issue of innocence is slight.' " (*Id.* at p. 652.) Anderson seizes on the observation in *Williams* that "flight is significantly different than the absence of flight" because "[f]light is by its nature an active, conscious activity . . . ." (*Ibid.*) Based on this statement, Anderson asserts he did not respond to a police request for cooperation but deliberately invited police inquiry into his conduct, which constitutes conscious activity, not its absence. Therefore, his conduct after the library confrontation was not equivalent to the absence of flight.

Although the trial court's analogy may have been flawed, the trial court did not exclude the proffered evidence based on its similarity to the absence of flight. The trial court merely noted admission of the letter into evidence was "in essence, an end run around the hearsay rule in much the same way that absence of flight is an end run around the flight instruction . . . ." In sum, the trial court properly excluded the letter to Chief Farris as hearsay.

The fact Anderson testified does not alter the result.

In claiming this factor is determinative, Anderson focuses on the sentence that completes the above quoted paragraph from *Cudjo* which states, "Neither the hearsay rule nor its exceptions are concerned with the credibility of witnesses who testify directly to the jury." (*People v. Cudjo, supra*, 6 Cal.4th at p. 608.) Anderson asserts he was not attempting to offer hearsay in lieu of testifying (see *People v. Gurule* (2002) 28 Cal.4th 557, 605–606 [123 Cal.Rptr.2d 345, 51 P.3d 224]) and, because he testified at trial and subjected himself to cross-examination, the hearsay rule was inapplicable.

However, the quotation cannot be read to stand for the proposition a testifying defendant may relate all manner of hearsay without restriction. In fact, the law appears to be settled to the contrary. In *People v. Williams* (2006) 40 Cal.4th 287 [52 Cal.Rptr.3d 268, 148 P.3d 47], the trial court excluded evidence of a videotaped police interview in which the defendant cried and minimized his culpability. (*Id.* at pp. 317–318.) In upholding this ruling, *Williams* cited *People v. Jurado* (2006) 38 Cal.4th 72 [41 Cal.Rptr.3d 319, 131 P.3d 400], which held "the circumstance that defendant made his statements during a postarrest police interrogation, when he had a compelling motive to minimize his culpability for the murder and to play on the sympathies of his interrogators, indicated a lack of trustworthiness. In past decisions, we have upheld the exclusion of self-serving postcrime statements made under similar circumstances. [Citations.]" (*Id.* at p. 130.)

Anderson claims *People v. Williams, supra*, 40 Cal.4th 287, and *People v. Jurado* are inapposite because neither defendant testified. Although this observation is correct with respect to *Jurado*, the defendant in *Williams* pleaded guilty to murder and other offenses and admitted two special circumstance allegations and thereafter testified at the penalty phase of the trial. (*People v. Williams, supra*, at pp. 297–299.) Like the right to testify in one's own defense, the right to present mitigating evidence at the penalty phase of a capital case is constitutionally guaranteed. (See *Green v. Georgia* (1979) 442 U.S. 95, 97 [60 L.Ed.2d 738, 99 S.Ct. 2150]; *Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 98 S.Ct. 2954].) Thus, *Williams* provides strong support for the trial court's ruling here.

Moreover, even if the hearsay rule did not prevent Anderson from testifying about his conduct after the library confrontation, as discussed below, the trial court properly could limit Anderson's testimony in this regard under Evidence Code section 352 and, even if the trial court's ruling on this point were incorrect, the error was harmless.

Anderson also argues *Williams* and *Jurado* are distinguishable because there was no arrest in this case at the time Anderson wrote the letter and Anderson did not know Y. was going to the police. Thus, the content of the letter was more trustworthy than the statements at issue in those cases. However, Anderson knew Y. told a school counselor about the abuse in 2003, although she minimized it, and she had been interviewed about the abuse by police officers. Also, Y.'s e-mails to Anderson frequently mentioned the turmoil she was experiencing in deciding whether to report him. After the library confrontation, Anderson reasonably could conclude Y. had resolved to take some action with respect to the abuse. Thus, Anderson's letter to Chief Farris must be seen as a statement Anderson made after having been accused of sexually molesting Y. and therefore at a time when he had motive to fabricate, rendering it untrustworthy.

For the foregoing reasons, the trial court properly excluded evidence of the Andersons' letter to Chief Farris as hearsay.

e. *Evidence Code section 352.*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Anderson argues the trial court merely recited the factors set forth in the statute without specifying the circumstances on which it was relying.

Anderson claims the excluded evidence was not inflammatory, there was no danger it would have consumed more than a few minutes of court time, it would not have distracted the jurors from the central issue and the evidence was highly relevant and was likely to avoid juror confusion about Anderson's conduct after the library confrontation.

A trial court's decision to exclude evidence under Evidence Code section 352 is reviewed for an abuse of discretion. (*People v. Avila* (2006) 38 Cal.4th 491, 578 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

Here, the record reflects the trial court balanced the required factors, considered the proffered evidence in context, found its probative value was outweighed by the probability its admission would confuse, distract or mislead the jury and exercised its discretion to exclude it. Anderson complains the trial court's findings were vague and undetailed. However, the trial court repeatedly made express findings related to the admissibility of the evidence. Notably, the trial court found: "This is the type of evidence that just leads nowhere except to confusion, speculation, sur[m]ise and supposition. It confounds the jury and diverts and distracts their attention."

■ In any event, a trial court is not required to make detailed factual findings when excluding evidence under Evidence Code section 352. "All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 213 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Unquestionably, the trial court's findings met that standard.

In sum, the trial court made a reasonable decision to exclude the evidence based on the circumstances presented. No abuse of the trial court's discretion appears.

> f. *The trial court's ruling did not infringe Anderson's right to present a defense.*

Anderson argues that, as a result of the trial court's exclusion of evidence of his conduct after the library confrontation, he was denied the right to testify in his own words and to present critical defense evidence. (*Rock v. Arkansas* (1987) 483 U.S. 44, 51–53 [97 L.Ed.2d 37, 107 S.Ct. 2704]; *Chambers v. Mississippi, supra,* 410 U.S. at p. 302.) He claims the trial court's exclusion of the evidence violated the rule that "restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve." (*Rock v. Arkansas, supra,* at pp. 55–56.) Anderson asserts no legitimate state interest outweighed his right to explain his actions in response to the library confrontation.

The right to testify in one's own behalf is "fundamental." (*People v. Lancaster* (2007) 41 Cal.4th 50, 100 [58 Cal.Rptr.3d 608, 158 P.3d 157].) However, the right is "not unlimited, but rather is subject to reasonable restrictions." (*United States v. Scheffer* (1998) 523 U.S. 303, 308 [140 L.Ed.2d 413, 118 S.Ct. 1261]; *People v. Boyette* (2002) 29 Cal.4th 381, 427–428 [127 Cal.Rptr.2d 544, 58 P.3d 391] [application of the ordinary rules of evidence does not impermissibly infringe a defendant's right to present a defense].) These restrictions include " 'rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " (*Rock v. Arkansas, supra,* 483 U.S. at pp. 55–56, fn. 11, quoting *Chambers v. Mississippi, supra,* 410 U.S. at p. 302.)

An appellate court must evaluate whether the interests served by application of an evidentiary rule "justify the limitation imposed on the defendant's constitutional right to testify." (*Rock v. Arkansas, supra,* 483 U.S. at p. 56.) An arbitrary restriction on a defendant's right to testify is one that "exclude[s] important defense evidence but that [does] not serve any legitimate interests." (*Holmes v. South Carolina* (2006) 547 U.S. 319, 325 [164 L.Ed.2d 503, 126 S.Ct. 1727].) Application of ordinary rules of evidence to exclude " 'defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense. [Citation.]' " (*People v. Boyette, supra,* 29 Cal.4th at p. 428.) For a defendant's constitutional rights to override the application of ordinary rules of evidence, " 'the proffered evidence must have more than "slight-relevancy" to the issues presented. [Citation.] . . . [Citation.] The proffered evidence must be of some competent, substantial and significant value. [Citations.]' [Citation.]" (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457 [78 Cal.Rptr.3d 474].)

Evidence Code section 352 is part of a trial court's "traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.]" (*People v. Hall* (1986) 41 Cal.3d 826, 834 [226 Cal.Rptr. 112, 718 P.2d 99].) Thus, Evidence Code section 352 "incorporates a compelling state interest, i.e., the policy in favor of an orderly trial on the merits." (*People v. Hall, supra,* at p. 835.) The United States Supreme Court has found statutes similar to Evidence Code section 352 constitutional. (*Holmes v. South Carolina, supra,* 547 U.S. at pp. 326–327.) *Holmes* noted the Constitution is not offended by "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. [Citations.]" (*Holmes,* at p. 326.) The hearsay rule similarly is a well-established rule of evidence designed to prevent the admission of untrustworthy evidence.

Moreover, contrary to Anderson's assertion, the excluded evidence was not critical to his defense and was only marginally relevant. Anderson claims reasonable jurors would have assumed he did more than go home and chat with his wife after this meeting, which he testified felt like an extortion attempt. He claims the inability to produce evidence of his conduct in the wake of the "confession" had great potential adversely to affect his credibility in the eyes of the jury.

At the outset, we note the trial court found the content of the letter and the inferences Anderson sought to have the jury draw from his conduct after the library confrontation were not trustworthy because, at the time Anderson wrote the letter, he "certainly had a bias, motive for fabrication, or other improper motive." The record amply supports the trial court's assessment. Anderson knew Y. had been interviewed about the allegations by police officers and her e-mails increasingly sought apologies from Anderson and repeatedly asked why she should not report him. Thus, the letter was written at a time when Anderson had a strong motive to discredit Y. and to minimize incriminating aspects of their relationship.

Also, in the context of the entire trial, evidence of Anderson's conduct after the library confrontation was not critical. Anderson testified about his interactions with Y. from the start of their relationship through the library confrontation on July 1, 2004. He related his interpretation of his e-mails and explained his thoughts and the statements he made during the library confrontation. He also testified that, after the library confrontation, he went home and spoke with his wife.

Anderson's wife also testified. She claimed she and Anderson discussed their concern for Y. over a period of months. She described Y.'s happy invitation to the library meeting and Anderson's shaken appearance when he returned from it. Evidence that Anderson and his wife wrote a letter to Chief Farris describing their view of the incident, which they related fully at trial from the witness stand, was not critical to Anderson's defense. Its exclusion therefore did not infringe upon Anderson's constitutional rights.

Neither *Rock v. Arkansas, supra,* 483 U.S. 44, nor *Chambers v. Mississippi, supra,* 410 U.S. 284, assists Anderson. In *Rock,* the defendant remembered details of a charged murder only after undergoing hypnosis. Arkansas had a per se rule prohibiting all hypnotically refreshed testimony, which the trial court applied to prevent the defendant from testifying about key facts of the killing. (*Rock v. Arkansas, supra,* at p. 56.) *Rock* held the per se exclusion of this evidence "had a significant adverse effect on [the defendant's] ability to testify. It virtually prevented her from describing any of the events that occurred on the day of the shooting, despite corroboration of many of those

events by other witnesses. Even more importantly, . . . [the defendant] was not permitted to describe the actual shooting except in the words contained in [the hypnotist's] notes." (*Id.* at p. 57.)

Here, the trial court did not rely on a per se rule of exclusion to prevent Anderson from testifying about critical facts in issue. Rather, it reasonably exercised its discretion pursuant to Evidence Code section 352 to exclude marginally relevant evidence that was likely to confuse the issues and distract the jury.

In *Chambers v. Mississippi, supra,* 410 U.S. 284, the defendant was charged with murder. A witness signed a sworn confession to the murder and made inculpatory statements to others. At trial, the witness denied involvement in the homicide and repudiated the confession. The trial court precluded the defendant from cross-examining the witness or calling other witnesses to discredit the repudiation and testify about the confession based on the state's "voucher" rule, which limited cross-examination to adverse witnesses. (*Id.* at pp. 295–296.) Further, although Mississippi recognized a hearsay exception for statements against a declarant's pecuniary interest, it did not recognize an exception for statements against a declarant's penal interest.

*Chambers* found a denial of due process in the application of the "voucher" rule, which had resulted in the exclusion of strong exculpatory evidence. (*Chambers v. Mississippi, supra,* 410 U.S. at pp. 289, 302.) As to the hearsay rule, *Chambers* recognized potential problems of reliability with statements against penal interest but found, in the circumstances of that case, the excluded testimony "bore persuasive assurances of trustworthiness" and "also was critical to [the] defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." (*Id.* at p. 302.)

Evidence Code section 352 is unlike the "voucher" rule, which *Chambers* noted "has been condemned as archaic, irrational, and potentially destructive of the truth-gathering process. . . . [Citation.]" (*Chambers v. Mississippi, supra,* 410 U.S. at p. 296, fn. 8.) Further, because the evidence Anderson sought to place before the jury was not critical to the defense, there " ' "was no refusal to allow [defendant] to present a defense, but only a rejection of some evidence concerning the defense." [Citation.]' " (*People v. Boyette, supra,* 29 Cal.4th at p. 428.)

The conclusion the trial court's ruling did not violate the *Rock/Chambers* rule finds support in *United States v. Scheffer.* In *Scheffer,* the defendant sought to introduce polygraph evidence to support his testimony he did not

knowingly use drugs. *Scheffer* held an evidentiary rule that excluded all polygraph evidence was constitutional on the facts presented because it did not "undermine[] fundamental elements of the [defendant's] defense." (*United States v. Scheffer, supra*, 523 U.S. at p. 315.) *Scheffer* noted the trier of fact "heard all the relevant details of the charged offense from the perspective of the accused . . . ." (*Id.* at p. 317.)

■ Here, as in *Scheffer*, Anderson testified in detail to all aspects of the charged offenses and related his thought process at all relevant times. Anderson's defense was not significantly impaired by the exclusion of evidence of his conduct after the library confrontation, including the letter to Chief Farris.

In sum, the trial court did not exclude critical defense evidence, did not arbitrarily restrict Anderson's right to present a defense and did not apply the rules of evidence in a manner that was disproportionate to the purposes they were designed to serve.

g. *Adoptive admissions.*

Anderson contends that, because his statements in response to Y.'s accusations during the library confrontation were received into evidence as adoptive admissions (Evid. Code, § 1221), his conduct after the library confrontation should have been considered part of his response to Y.'s accusations.[9] He asserts the fact he did not respond in Y.'s presence did not justify exclusion of evidence concerning his conduct after the library confrontation. He claims a response to an accusation need not be contemporaneous with the accusation, citing *People v. Riggs* (2008) 44 Cal.4th 248, 290 [79 Cal.Rptr.3d 648, 187 P.3d 363].

■ This claim is not persuasive. "There are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in*, the truth of such hearsay statement.' [Citation.]" (*People v. Silva* (1988) 45 Cal.3d 604, 623 [247 Cal.Rptr. 573, 754 P.2d 1070].) Under Evidence Code section 1221, " 'If a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment

---

[9] Evidence Code section 1221 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth."

to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt.' [Citations.]" (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

Here, the library confrontation occurred on July 1, 2004. Anderson delivered the letter to Chief Farris on July 6, 2004, and Anderson's cooperation with the investigators occurred on July 9, 2004. Thus, Anderson's conduct was not proximate in time to the library confrontation and cannot be seen as part of Anderson's responses to Y.'s accusations during the library confrontation. Further, the letter and Anderson's conduct after the library confrontation were not admissions made in response to Y.'s accusation during the library confrontation but were denials intended to discredit her and to exculpate himself, as the trial court found.

*Riggs* does not support Anderson's claim. The defendant in *Riggs* admitted to a detective that a murder " 'happened exactly like' " an accomplice, who also had been arrested and had decided to cooperate with authorities, described it to the police except the accomplice " 'left out' " " 'the most important things.' " (*People v. Riggs, supra,* 44 Cal.4th at p. 289.) The accomplice's description of the crime to the police was recounted in an episode of the television program, *America's Most Wanted,* which aired a few days before the interview. The defendant in *Riggs* did not dispute the admissibility of his statement to the detective but contended the trial court abused its discretion in allowing the prosecution to show the jury an edited segment of the program because, at most, he had adopted only part of what the accomplice told the police and the program included irrelevant elements and was cumulative and unduly prejudicial. *Riggs* concluded the trial court did not abuse its discretion in allowing the jury to see the edited segment in order to give context to the defendant's statement that he saw the episode and agreed, to some degree, with what was depicted in it.

Nothing in *Riggs* suggests a defendant has an indefinite period of time within which to respond to an accusatory statement made in a face-to-face confrontation with an accuser. Anderson's conduct after the library confrontation, which sought to distance himself from the damaging statements he made during the library confrontation, did not constitute part of his adoptive admissions.

h. *Evidence Code section 1202.*

Evidence Code section 1202 states, "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant

received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing."

Anderson relies on *People v. Baldwin* (2010) 189 Cal.App.4th 991 [118 Cal.Rptr.3d 68], which held that where a defendant's hearsay admission is received into evidence, "by its plain language, [Evidence Code] section 1202 permitted [the defendant] to introduce his prior inconsistent statements to attack his own credibility as a hearsay declarant . . . even though he was available to testify." (*Id.* at p. 1003.)

Anderson argues his letter to Chief Farris was admissible to impeach his hearsay statements recorded during the library confrontation, which were introduced under the hearsay exception for admissions by a party, to attack his own credibility.

■ However, *Baldwin* emphasized "that [Evidence Code] section 1202 does not give the defendant carte blanche to introduce any and all statements purportedly inconsistent with the party admissions used by the prosecution. The trial court retains discretion under [Evidence Code] section 352 to regulate the introduction of such evidence." (*People v. Baldwin, supra*, 189 Cal.App.4th at p. 1005.) Because the trial court in this case properly excluded evidence of Anderson's conduct after the library confrontation under Evidence Code section 352, *Baldwin* does not assist Anderson.

 i. *The prosecutor did not take unfair advantage of the trial
 court's ruling and any error was harmless.*

Anderson contends the prosecution improperly capitalized on the exclusion of evidence of Anderson's conduct after the library confrontation by arguing "Anderson did nothing to deny Y.'s allegations." Anderson claims exclusion of the letter to Chief Farris allowed the prosecutor to argue Anderson's conduct during the library confrontation demonstrated consciousness of guilt because "this brilliant man couldn't just walk away," and the reason he did not was "because he wanted to continue to control her, tried to appease her, telling her he was sorry and hope[d] she would not go to the police."

Anderson claims this argument would have been untenable had the trial court permitted Anderson to explain he went to the police after the library confrontation and reported what had occurred. Anderson notes that, in *People v. Minifie* (1996) 13 Cal.4th 1055, 1071–1072 [56 Cal.Rptr.2d 133,

920 P.2d 1337], evidence of third party threats erroneously was excluded and the factor that made the error reversible was the prosecutor's argument there was no evidence to support the defendant's claim he was in fear when he committed an assault. Anderson asserts the prosecutor could not have argued Anderson was desperate to manipulate and control Y. and "to continue to have that secret kept secret" if Anderson had been permitted to present evidence indicating he informed Chief Farris of Y.'s accusations a few days after the library confrontation.

However, the prosecution's argument was directed at Anderson's conduct *during* the library confrontation, not his conduct afterwards. The prosecutor would have made the same argument had evidence of Anderson's conduct after the library confrontation been admitted. Thus, the prosecutor did not take unfair advantage of the trial court's ruling.

Anderson also asserts exclusion of the letter requires reversal because the jury was likely to draw an adverse inference from his failure to take action that might be expected of an innocent man who incautiously had just said anything in an attempt to get away from an accuser. Reasonable jurors might have felt Anderson would have asked the police for help, especially in light of his relationship with law enforcement, if Anderson had nothing to hide. Although that is what Anderson did, it was concealed from the jury.

Anderson further contends exclusion of the evidence was prejudicial because the prosecutor produced no physical evidence to corroborate Y.'s claims and Y.'s credibility was called into doubt in numerous respects. Specifically, he claims Y.Z. did not recall the toe-biting incident, even though she was present, Y. denied she kept a journal but disclosed on cross-examination she kept one online and she acknowledged that, as a teenager, she sometimes lied. Also, Y.'s friend testified Y. said the abuse occurred in Anderson's car and Y.'s testimony that Anderson permitted her to drive his car on the freeway conflicted with Anderson's denial this occurred, which was more reasonable given the danger involved in permitting a middle school student to drive on the freeway.

Anderson claims exclusion of his conduct after the library confrontation created an "evidentiary gap" which left the jury to wonder what happened after Anderson's meeting with Y. at the library. Anderson argues the restriction of his right to testify must be tested under the *Chapman* standard. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

Contrary to Anderson's claim, the *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]) applies where a trial court permits

a defendant to present a defense but excludes some evidence concerning the defense. (See *People v. Boyette, supra,* 29 Cal.4th 381, 428; *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089 [56 Cal.Rptr.2d 142, 921 P.2d 1].) In any event, the error was harmless under either standard.

Anderson testified he went home after the library confrontation and spoke to his wife for about an hour. The fact the jury might wonder about matters not presented to them does not warrant reversal of Anderson's conviction.

Moreover, as has been noted, Anderson testified extensively about his relationship with Y., his e-mails to her and the statements he made during the library meeting. Anderson's letter, the content of which was suspect and unreliable, would not have affected the jury's decision. Notwithstanding minor discrepancies in the evidence, Y.'s testimony about her relationship with Anderson was corroborated by Anderson's own words in his e-mails and in the recorded conversation. The jury spent less than two days deliberating four counts after a trial that lasted more than a month. Based on this record, any error in the exclusion of the letter to Chief Farris or evidence of Anderson's conduct after the library confrontation was harmless under any standard of review.

In resisting this conclusion, Anderson repeatedly cites a remark the trial court made in the course of one of the many colloquies on the admissibility of the evidence. After defense counsel observed the People often cross-examine defense witnesses as to why they did not come forward sooner to present their assertedly exculpatory evidence, the trial court invited a response from the prosecutor and asked, "Doesn't it leave a completely incorrect impression to preclude the defense from bringing this out?" The prosecutor responded the situation posed by defense counsel arises when a defendant presents an alibi witness, which is not similar to the circumstances of this case. Viewed in context, the trial court's remark reveals conscientious consideration of Anderson's argument and does not suggest the trial court's eventual ruling was incorrect or ill considered.

For all the foregoing reasons, the trial court committed no reversible error in the exclusion of evidence of Anderson's conduct after the library confrontation.

2. *Conviction of both continuous sexual abuse and three counts of lewd act.*

a *Background.*

Consideration of Anderson's contention he cannot be convicted of continuous sexual abuse and three counts of lewd act based on generic testimony that

describes a single continuous course of conduct against one victim requires some historical perspective.

Prior to *People v. Jones, supra*, 51 Cal.3d 294, there was a split of authority as to whether generic testimony could support a conviction of a sexual offense. The problem typically arose in the prosecution of " 'resident child molester[s],' " i.e., those who live with or have continuous access to their victim. (*Id.* at p. 299.) One line of cases, referred to as the *Van Hoek* line of cases, reversed convictions of sexual offenses obtained against resident child molesters based on generic testimony. (See *People v. Vargas* (1988) 206 Cal.App.3d 831, 845–847 [253 Cal.Rptr. 894]; *People v. Atkins* (1988) 203 Cal.App.3d 15, 19–23 [249 Cal.Rptr. 863]; *People v. Van Hoek* (1988) 200 Cal.App.3d 811, 814–818 [246 Cal.Rptr. 352].) These holdings were grounded in principles of due process, juror unanimity and sufficiency of the evidence. (*People v. Jones, supra*, at pp. 308–311.)

Another line of cases held generic testimony could be sufficient to support a conviction of a sexual offense committed by a resident child molester. (See *People v. Moore* (1989) 211 Cal.App.3d 1400, 1411–1416 [260 Cal.Rptr. 134]; *People v. Moreno* (1989) 211 Cal.App.3d 776, 786–790 [259 Cal.Rptr. 800]; *People v. Obremski* (1989) 207 Cal.App.3d 1346, 1351–1354 [255 Cal.Rptr. 715]; *People v. Jeff* (1988) 204 Cal.App.3d 309, 339–343 [251 Cal.Rptr. 135].) Several cases called upon the California Supreme Court or the Legislature to resolve the conflict. (*People v. Jones, supra*, 51 Cal.3d at p. 310.)

In 1989, the Legislature enacted section 288.5 which established a new crime of continuous sexual abuse of a child. Section 288.5, subdivision (a), provides, in relevant part: "Any person who . . . has recurring access to [a] child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, . . . or three or more acts of lewd or lascivious conduct, as defined in Section 288, with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years."[10]

Section 288.5, subdivision (b) provides, "To convict under this section the trier of fact, if a jury, need unanimously agree only that the requisite number of acts occurred not on which acts constitute the requisite number."

---

[10] The penalty for violating section 288, subdivision (a) is three, six or eight years in state prison.

Section 288.5, subdivision (c) states limitations on the applicability of the offense. As enacted and at the time of trial it provided: "No other felony sex offense involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative. A defendant may be charged with only one count under this section unless more than one victim is involved in which case a separate count may be charged for each victim." (Former § 288.5, subd. (c).)[11]

■ The year after the Legislature enacted section 288.5, *People v. Jones* disapproved the *Van Hoek* line of cases and held a child's generic testimony does not offend the requirement of a unanimous verdict or deprive a defendant of due process and thus could support a conviction of lewd act. *Jones* explained that "even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." (*People v. Jones, supra*, 51 Cal.3d at p. 314, italics added.) *Jones* noted particular details, such as date, time or place, may assist with credibility determinations but "are not elements of the offense and are unnecessary to sustain a conviction." (*Id.* at p. 315.)

*Jones* concluded that, "because credibility is usually the 'true issue' in these cases, 'the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it. In either event, a defendant will have his unanimous jury verdict [citation] and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, for if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act [citations].' " (*People v. Jones, supra*, 51 Cal.3d at p. 322.)

*People v. Johnson* (2002) 28 Cal.4th 240 [121 Cal.Rptr.2d 197, 47 P.3d 1064], summarized the ways in which prosecutors may "seek convictions and severe punishments in cases involving sexual offenses against vulnerable young victims. They may, for example, plead and prove discrete sexual offenses and seek consecutive sentencing when permitted; they may bring a charge of continuous sexual abuse, with its relatively severe range of punishments (§ 288.5, subd. (a)); they may charge continuous sexual abuse

---

[11] The first sentence of section 288.5, subdivision (c) currently provides: "No other act of substantial sexual conduct, as defined in subdivision (b) of Section 1203.066, with a child under 14 years of age at the time of the commission of the offenses, or lewd and lascivious acts, as defined in Section 288, *involving the same victim may be charged in the same proceeding with a charge under this section unless the other charged offense occurred outside the time period charged under this section or the other offense is charged in the alternative.*" (See Stats. 2006, ch. 337, § 8, p. 2590, eff. Sept. 20, 2006.)

and discrete sexual offenses outside the period of the alleged continuous abuse (*People v. Cortes* (1999) 71 Cal.App.4th 62, 80 [83 Cal.Rptr.2d 519]); . . . or they may charge discrete sexual offenses and continuous sexual abuse in the alternative." (*People v. Johnson, supra*, at p. 248.)

### b. *Anderson's arguments.*

Anderson contends that, because section 288.5 proscribes a course of conduct (*People v. Cortes, supra*, 71 Cal.App.4th at p. 75) and lowers the unanimity hurdle (*People v. Johnson, supra*, 28 Cal.4th at p. 247), the Legislature intended the one charge per victim limitation to conform with case law recognizing that, "[w]hen a criminal statute punishes a course of conduct, the prosecution may not divide that course up into multiple counts of the offense; the entire continuous course constitutes only a single violation of the statute. [Citation.]" (*People v. Avina* (1993) 14 Cal.App.4th 1303, 1311 [18 Cal.Rptr.2d 511].) Anderson asserts the limitation of one count per victim corresponds with the severity of the punishment under section 288.5, which reflects the requirement of multiple acts to establish the offense.

Also, *People v. Avina* noted generic testimony presents a potential for unfairness for the victim and for the perpetrator and, in enacting section 288.5, the Legislature sought "a rational, fair reconciliation of these conflicting considerations." (*People v. Avina, supra*, 14 Cal.App.4th at p. 1312.) "The statute . . . allows prosecutors to seek significant penalties against the resident molester, without demanding unrealistic precision from the child witness. At the same time, it limits the offender's potential liability to a single count against a given victim, thus eliminating the potential for arbitrary variation in charging and punishment present under section 288." (*Ibid.*)

Anderson argues none of the decisions following *Jones* purports to override the Legislature's "fair reconciliation" of the competing interests involved in generic testimony cases. (*People v. Avina, supra*, 14 Cal.App.4th at p. 1312.) Anderson claims the prosecutor in this case divided a single course of conduct into several, charging one under section 288.5 and the others under section 288, subdivision (a), even though section 288.5 carries enhanced penalties premised on the limitation that only one such count may be charged per victim.

Anderson asserts the Legislature believed such a combination of charges would be improper because, at the time section 288.5 was enacted, generic testimony was barred by *Van Hoek*. Thus, according to Anderson, charges brought in addition to a violation of section 288.5 must be for specific incidents of molestation. Anderson claims section 288.5 coexists with a parallel charging scheme for prosecuting sex offenses based on generic

testimony under *Jones*. Here, the prosecution mixed the two charging schemes so as to evade the one charge per victim mandate of section 288.5, subdivision (c).

### c. *Resolution.*

 Anderson's argument fails because he was charged with only one continuous course of conduct offense, the count of continuous sexual abuse in violation of section 288.5. A violation of section 288, subdivision (a) is not a continuous course of conduct offense, even when it is based on generic testimony. Given that *Jones* approved the use of generic testimony in resident child molester cases, it follows that violations of section 288, subdivision (a) based on generic testimony may be charged in addition to a violation of section 288.5 where the abuse continues beyond the three-month period required for a conviction under section 288.5.

 Anderson's reliance on section 288.5, subdivision (c)'s limitation of one violation of section 288.5 per victim is misplaced. As noted in *People v. Johnson*, the People may "charge continuous sexual abuse and discrete sexual offenses outside the period of the alleged continuous abuse . . . ." (*People v. Johnson, supra*, 28 Cal.4th at p. 248.) Thus, separate violations of section 288, subdivision (a) may be charged as long as they are based on conduct that occurred outside the time period charged under section 288.5. Here, the violations of section 288, subdivision (a), were alleged to have occurred outside the time period alleged pursuant to section 288.5. Thus, subdivision (c) of section 288.5 has no application here.

Although no case has expressly addressed the issue raised by Anderson, *People v. Cortes, supra*, 71 Cal.App.4th 62, suggests the claim lacks merit. In *Cortes*, the prosecution charged one count of continuous sexual abuse in violation of section 288.5 from June 1994 to February 16, 1996, and one count of rape on February 17, 1996. (*People v. Cortes, supra*, at p. 75.) The defendant argued the prosecution had alleged an "arbitrarily shortened period solely to circumvent the prohibition in Subdivision (c) against charging individual crimes committed *during* the period of continuous abuse. Defendant argues that the statute must be construed to prevent such circumvention, which undermines the purpose of the prohibition. Consequently, he urges us to construe Subdivision (c) to require that prosecutors allege the *entire* period of continuous sexual abuse shown by the evidence, if, as here, they seek convictions for continuous abuse *and* additional specific sexual offenses." (*Id.* at p. 76.)

 *Cortes* rejected this argument, finding no requirement that a prosecutor allege any more than the minimum period of time necessary to prove a

violation of section 288.5. *Cortes* stated, "those who prolong periods of continuous abuse should be more, not less, vulnerable to additional convictions in order to ensure that their punishment can be commensurate with their culpability. Indeed, by permitting prosecutors to seek additional convictions for offenses committed *outside* the alleged period, the Legislature contemplated that a defendant may be convicted of both a course of sexual misconduct and individual sexual offenses against the same victim and thus clearly intended that liability reflect culpability. [Citation.]" (*People v. Cortes, supra*, 71 Cal.App.4th at p. 78.)

Although the testimony supporting the additional charges in *Cortes* was not generic, nothing in *Cortes* suggests this was necessary. In light of *Jones*, which eliminated any distinction between generic and nongeneric testimony in the prosecution of resident child molesters, there was no occasion to address the distinction.

Here, the prosecutor properly charged Anderson with "continuous sexual abuse and discrete sexual offenses outside the period of the alleged continuous abuse . . . ." (*People v. Johnson, supra*, 28 Cal.4th at p. 248.) *Johnson's* references to "specific sexual offenses" and "discrete sexual offenses" is contrasted with violations of section 288.5 to mean offenses that are noncontinuous. After *Jones*, violations of section 288, subdivision (a) and other "specific" or "discrete" crimes may be proven by generic testimony. The only limitations on a prosecutor's ability to charge violations of section 288.5 are stated in subdivision (c). None of those limitations was violated.

In sum, Anderson properly was charged with and convicted of one count of continuous sexual abuse in violation of section 288.5 and three counts of lewd act in violation of section 288, subdivision (a), each covering a different time period.

> 3. *The instruction on uncharged offenses admitted to prove propensity did not lower the People's burden of proof on the charged offenses.*
>
> a. *Background.*

The trial court granted the People's request to introduce evidence of the punching bag incident and the toe-biting incident, which occurred in 1997 and 1998, respectively, to show Anderson's propensity to commit the charged offenses.[12] These incidents originally were charged as violations of section

---

[12] In general, character or disposition evidence is inadmissible to prove a defendant's conduct on a specified occasion. (Evid. Code, § 1101, subds. (a), (b).) Evidence Code section 1108 creates an exception to this rule and provides: "In a criminal action in which the

288, subdivision (a) but were dismissed on demurrer as time-barred. The trial court ruled, "The . . . incidents from 1997 to 1998 . . . are no longer before the fact finder, but that does not mean they disappear forever. They are unquestionably relevant as they relate to propensity evidence and other factors, . . . and I find that there does not exist a substantial prejudice as to those incidents."

In response to Anderson's argument the instruction on uncharged offenses, which allowed the jury to find Anderson committed the uncharged offenses by a preponderance of the evidence, permitted the jury improperly to conclude Anderson committed the charged offenses by the same standard, the trial court stated: "The jury instructions are clear and direct. The jury's attention is directed to the fact that they may not, should not, and cannot convict the defendant of a charged offense unless each juror is satisfied independently there is proof beyond a reasonable doubt that the defendant committed the offense charged and that any prior offense is received for a limited purpose and cannot be used to bootstrap."

Thereafter, the trial court instructed the jury: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt, unless I specifically tell you otherwise." "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless this evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

As to the uncharged offenses admitted to show propensity the jury was instructed: "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offenses. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. . . . [¶] If you decide that the defendant committed the uncharged offenses, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit counts 1 through 4, as charged here. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one

---

defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).)

factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of counts 1 through 4. The People must still prove beyond a reasonable doubt each element of every charge. [¶] Do not consider this evidence for any other purpose."

b. *Anderson's claim of instructional error.*

Anderson contends the preponderance standard applied to the uncharged offenses impermissibly reduced the People's burden of proof on the charged offenses. He relies on the fact that one of the uncharged offenses, the punching bag incident, involved substantial sexual contact and marked the start of the alleged continuous course of conduct. Anderson claims that, because this incident was the first act of abuse, it was part of "the direct chain of proof" of his guilt and therefore had to be proved beyond a reasonable doubt. (*People v. Tewksbury* (1976) 15 Cal.3d 953, 965, fn. 12 [127 Cal.Rptr. 135, 544 P.2d 1335].) Further, given that the case was based on generic testimony, the jury likely convicted because it agreed all the acts took place. (*People v. Jones, supra,* 51 Cal.3d at pp. 321–322.) Anderson concludes that, once the jury determined the first alleged act of abuse occurred by only a preponderance of the evidence, it would not thereafter apply a different standard for the charged offenses.

Anderson also argues the instruction created a mandatory presumption of an ultimate fact from the existence of predicate facts, which is constitutional only if the predicate facts " 'are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings . . . functionally equivalent to finding the element required to be presumed,' " so that the reviewing court is able to conclude the presumption played no significant role in finding the accused guilty beyond a reasonable doubt. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 281 [124 L.Ed.2d 182, 113 S.Ct. 2078].)

Anderson further asserts the instruction permitted the jury to convict based on an incorrect legal theory. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1130 [17 Cal.Rptr.2d 365, 847 P.2d 45].) Also, the instruction permitted the jurors to determine Y.'s credibility, and thus Anderson's guilt, under a preponderance of the evidence standard. When an erroneous instruction "eases the jury's task, 'there is no reason to believe the jury would have deliberately undertaken the more difficult task'. . . ." (*Connecticut v. Johnson* (1983) 460 U.S. 73, 85 [74 L.Ed.2d 823, 103 S.Ct. 969].)

Anderson claims reversal is required because it is reasonably likely the jury applied the instructions in a manner that lessened the government's burden of proof and there is a reasonable probability the error contributed to the verdict. (*In re Winship* (1970) 397 U.S. 358, 361 [25 L.Ed.2d 368, 90 S.Ct. 1068].)

c. *Resolution.*

■ The California Supreme Court has held the preponderance standard to be the proper standard under which to admit evidence of prior bad acts. (*People v. Carpenter* (1997) 15 Cal.4th 312, 382 [63 Cal.Rptr.2d 1, 935 P.2d 708], superseded by statute on another point as noted in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106 [77 Cal.Rptr.3d 287, 183 P.3d 1250], which in turn was superseded by statute on another point as noted in *Maldonado v. Superior Court* (2012) 53 Cal.4th 1112, 1119, fn. 5 [140 Cal.Rptr.3d 113, 274 P.3d 1110].) As noted in *People v. Carpenter, supra,* at page 382, the United States Supreme Court, interpreting the Federal Rules of Evidence, also has adopted the preponderance standard for proof of uncharged bad acts, citing *Huddleston v. United States* (1988) 485 U.S. 681, 687, footnote 5, 690 [99 L.Ed.2d 771, 108 S.Ct. 1496] and *Bourjaily v. United States* (1987) 483 U.S. 171, 176 [97 L.Ed.2d 144, 107 S.Ct. 2775].

■ The uncharged offense instruction given here was based on CALCRIM No. 1191. That instruction and a similar instruction, CALJIC No. 2.50.01, have been upheld against claims they unconstitutionally lower the prosecution's burden of proof. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1013–1014 [130 Cal.Rptr.2d 254, 62 P.3d 601] [upholding CALJIC No. 2.50.01]; *People v. Reyes* (2008) 160 Cal.App.4th 246, 250–252 [72 Cal.Rptr.3d 586] [upholding CALJIC No. 2.50.02, which addressed uncharged acts of domestic violence admitted under Evid. Code, § 1109]; *People v. Cromp* (2007) 153 Cal.App.4th 476, 479–480 [62 Cal.Rptr.3d 848] [CALCRIM No. 1191]; *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87 [57 Cal.Rptr.3d 922] [CALCRIM No. 1191].)

In *People v. Reliford*, the prosecution presented evidence indicating the defendant previously had raped a different victim in a manner similar to the charged offense. The defendant claimed that, "having found the uncharged sex offense true by a preponderance of the evidence, jurors would rely on 'this alone' to convict him of the charged offenses." (*People v. Reliford, supra,* 29 Cal.4th at p. 1013.) *Reliford* rejected the argument because the instruction specifically stated, " 'if you find by a preponderance of the evidence that the defendant committed a prior sexual offense . . . , that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime.' " (*Ibid.*) *Reliford* found, "No reasonable juror would believe those requirements could be satisfied solely by proof of uncharged offenses." (*Id.* at pp. 1013–1014.) "[W]e will presume here that jurors can grasp their duty—as stated in the instructions—to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (*Id.* at p. 1016.)

Here, as in *Reliford*, the instruction specified the uncharged offenses were not sufficient alone to prove the charged offenses and reminded the jury the People still had the burden to prove "every element of every charge" beyond a reasonable doubt. Reviewing the instructions as a whole, and assuming jurors are capable of understanding and correlating jury instructions (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148–1149 [40 Cal.Rptr.3d 118, 129 P.3d 321]), there is no reasonable likelihood the instruction on uncharged offenses relieved the prosecution of its burden of proof with respect to the charged offenses.

Anderson's mandatory presumption claim fails because, as noted in *Reliford*, the instruction gives rise only to a permissive presumption. Also, nothing in the instruction permitted the jury to convict on an incorrect legal theory.

Finally, we reject Anderson's claim *Reliford* and the other cases cited above are distinguishable in that one of the instant uncharged offenses fell within the direct chain of proof of Anderson's guilt. (*People v. Tewksbury, supra,* 15 Cal.3d at p. 965, fn. 12.)

People v. Tewksbury "discussed the degrees of burdens of proof which may be placed on a defendant in a criminal case." (*People v. Figueroa* (1986) 41 Cal.3d 714, 721 [224 Cal.Rptr. 719, 715 P.2d 680].) *People v. Tewksbury, supra,* 15 Cal.3d at page 964 held, generally, a defendant need only raise a reasonable doubt as to the existence or nonexistence of a fact in issue. However, when a defendant raises "factual issues collateral to the question of the accused's guilt or innocence [that] do not bear directly on any link in the chain of proof of any element of the crime," such as an entrapment defense or whether a witness is an accomplice, the Constitution is not offended by requiring the defendant to prove such facts by a preponderance of the evidence. In footnote 12, cited by Anderson, *Tewksbury* stated: "When the People bear the burden of proof of a fact deemed to lie outside the direct chain of proof of an accused's guilt of the crime charged, they are not required to prove that fact beyond a reasonable doubt." (*People v. Tewksbury, supra,* at p. 965, fn. 12.)

From this, Anderson reasons a fact within the direct chain of proof of an accused's guilt must be proved beyond a reasonable doubt. However, the uncharged offenses were not in the direct chain of proof as that term is used in *Tewksbury*. Rather, a defendant's propensity to commit a particular type of crime, here lewd act, is the type of collateral fact addressed in *Tewksbury*. Anderson's propensity to commit such crimes does not "bear directly on any link in the chain of proof of any element of the crime." (*People v. Tewksbury,*

*supra*, 15 Cal.3d at p. 964.) The fact one of the uncharged offenses marked the start of Anderson's continuous course of conduct is insufficient to alter this result.

In a petition for rehearing, Anderson asserts the analysis of this issue must be reconsidered in light of *People v. Villatoro* (2012) 54 Cal.4th 1152 [144 Cal.Rptr.3d 401, 281 P.3d 390], filed four days after the opinion in this case. Anderson argues *Villatoro* calls into question the viability of *Reliford*. We disagree.

*Villatoro* primarily addressed whether Evidence Code section 1108 permitted evidence of *charged* offenses to be offered to prove propensity to commit other charged offenses and concluded "nothing in the language of section 1108 restricts its application to uncharged offenses." (*People v. Villatoro, supra*, 54 Cal.4th at p. 1164.) *Villatoro* next considered the claim a modified version of CALCRIM No. 1191 given by the trial court failed to designate clearly what standard of proof applied to the charged offenses before the jury could draw a propensity inference. The modified instruction did not provide the charged offenses offered to prove propensity could be proved by a preponderance of the evidence. Instead, the trial court modified the instruction to state: " 'The People must still prove each element of every charge beyond a reasonable doubt and prove it beyond a reasonable doubt before you may consider one charge as proof of another charge.' " (*People v. Villatoro, supra*, at p. 1167.) *Villatoro* concluded there was no risk the jury would apply an impermissibly low standard of proof as "the instruction clearly told the jury that all offenses must be proven beyond a reasonable doubt, even those used to draw an inference of propensity." (*Id.* at p. 1168.)

Anderson asserts the same modification should have been required here because the punching bag incident was a "component" of a charged offense, namely, the first act of sexual abuse in a continuous course of conduct alleged under section 288.5. However, *Villatoro* is not similar to Anderson's case in that the propensity evidence offered here consisted of *uncharged* offenses. The fact the punching bag incident was the first act of abuse does not make it a "component" of the charged offense of continuous sexual abuse as Anderson asserts. Accordingly, the jury properly was instructed the uncharged offenses offered to show propensity need be proved only by a preponderance of the evidence.

Anderson next argues *Reliford* is distinguishable in that it involved uncharged offenses committed against someone other than the victim in the pending case. However, uncharged offenses alleged to have been committed against someone other than the victim presents a more prejudicial situation. (See *People v. Falsetta* (1999) 21 Cal.4th 903, 917 [89 Cal.Rptr.2d 847, 986 P.2d 182] [probative value of other sex crimes increased, inter alia, by

"the independent sources of evidence (the victims) in each offense"].) The other concerns expressed in *Falsetta* also were avoided. There was no unfair burden on defendant to defend against the charged and uncharged offenses or judicial inefficiency due to "mini-trials" as the charged and uncharged offenses were part of a continuous course of misconduct against the same victim. (*Id.* at pp. 915–916.) Additionally, there was no undue prejudice attributable to the propensity evidence. The trial court specifically found the evidence was relevant and not unduly prejudicial. No abuse of discretion or instructional error appears in the trial court's rulings.

Accordingly, Anderson's claim fails.

## CONCLUSION

The trial court's rulings with respect to evidence related to Anderson's conduct after the library confrontation did not result in a denial of Anderson's right to testify in his own defense, Anderson properly was charged with and convicted of continuous sexual abuse and three counts of lewd act committed against a single victim based on generic testimony that indicated the abuse extended well beyond the three-month period necessary for a conviction of continuous sexual abuse, and the instruction on propensity evidence did not dilute the People's burden of proof with respect to the charged offenses.

## DISPOSITION

The judgment is affirmed.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied August 23, 2012, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 31, 2012, S205103.