Filed 9/29/15  P. v. Esver CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ARTHUR ANACLETO ESVER,<br><br>        Defendant and Appellant. | A143397<br><br>(Alameda County<br> Super. Ct. No. H50465) |

This is an appeal from judgment after a jury convicted defendant Arthur Anacleto Esver of committing five separate sex acts on a child age 10 or younger, including four counts of unlawful sexual intercourse or sodomy and one count of oral copulation or sexual penetration.  Defendant challenges the judgment on two grounds, first, violation of his constitutional right to due process based upon a jury instruction permitting consideration of his commission of two prior uncharged sex crimes so long as these prior crimes were established by a preponderance of the evidence and, second, violation of the constitutional prohibition against cruel and unusual punishment based upon his 115 year-to-life sentence.  Having considered each of defendant's contentions, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

On May 18, 2011, defendant was charged by information with four counts of unlawful intercourse or sodomy with a child age 10 or younger (Pen. Code, § 288.7, subd. (a); counts one through four), and one count of oral copulation or sexual penetration against a child age 10 or younger (Pen. Code, §§ 289, 288.7, subd. (b); count

1

five).[1]  All counts were alleged to have occurred between September 1, 2009 and March 6, 2011.  It was further alleged defendant committed all five counts on separate occasions against the same victim (§ 667.6, subds. (c)-(d)), and that defendant had sustained a prior strike conviction (§§ 1170.12, subd. (c)(1), 667, subd. (e)(1)).

A trial began on June 12, 2014, at which the following evidence was presented.

## I.  The Prosecution's Case.

On the evening of March 6, 2011, defendant's former wife, D.E., was at her home in San Leandro, which she shared with her daughter, M.Q., and M.Q.'s three children, including Jane Doe (hereinafter, the victim), age nine and in third grade.[2]  The victim, who had been acting "mouthy" and aggravated during dinner, asked somewhat urgently to speak privately with her grandmother.  Once D.E. agreed, the victim told her:  "My grandpa has been touching me."  When pressed for details, the victim pointed to her pubic area and told D.E. the touching had happened today and on previous occasions.  The victim then elaborated that defendant had put his penis into her pubic area, and "put it in my butt-butt too and it really hurted (*sic*) me."  D.E. asked the victim why she had not told her earlier, and the victim replied that "[defendant] said mommy would get really sick." The victim had been with defendant earlier that day, when he picked her up at her house and then took her to pick up a pizza for the family's dinner.  After telling the victim's mother what had transpired, the women contacted the police.

On March 7, 2011, the victim was interviewed by the Child Abuse Listening, Interviewing and Coordination (CALICO) center in San Leandro.  The victim told the interviewer that defendant had placed his penis into her "front part" and her "butt." Defendant had then told the victim that, if she told anyone, "they'll never let you come to my house ever."  The victim further reported that defendant began molesting her when she was about eight years-old and in the second grade.  The victim nonetheless continued visiting her grandfather because he kept promising the molestation would stop.

---

**1**    Unless otherwise stated, all further statutory references herein are to the Penal Code.

**2**    The victim was born in 2001.

2

The victim underwent a medical examination at Oakland's Children's Hospital. The medical examiner found no visible evidence of injury or infection on the victim; however, according to testimony from the hospital's medical director for child protection, about 90 to 95 percent of child victims have normal or unremarkable examinations after reporting having been molested.

A police search of defendant's home on March 7, 2011, led to the discovery of several tissues and napkins in his bedroom that were sent in for a crime lab analysis. This analysis rendered the following findings. Semen, but not sperm, was found on two of the tissues. The absence of sperm cells is consistent with the donor having had a vasectomy (which defendant had undergone) or low sperm count. In addition, the tissues contained commingled DNA. Neither the victim nor defendant could be eliminated as donors of this DNA. The probability of a random individual being attributed to the mixed profiles on the tissues was "one in 47.3 quintillion Caucasians, one in 409.5 quintillion African Americans, one in 1.09 quadrillion Southeast Hispanics, and one in 257.9 quadrillion Southwest Hispanics." When pressed at trial for further explanation of this analysis, the criminalist explained that the phrase, "cannot be excluded," means "he is the guy." However, the laboratory's policy required the criminalist to "say 'cannot be excluded.' "

At trial, D.E. acknowledged that, when the victim was living in San Leandro, she had told D.E. that she enjoyed spending time with defendant because he bought her "treats" and she loved "doing that stuff with him." D.E. also noted the victim had been getting into trouble recently and had spoken disrespectfully about defendant.

The victim, in turn, testified she never told anyone defendant was molesting her because he "was very special to me at first." In addition, defendant had told her that if she told anyone, she would never see him again. The victim did not want to lose her grandfather, and did not want to make her mother "emotional and scared." The victim ultimately identified five specific occasions during which defendant sexually abused her, each of which she described as follows.

3

**A.     Count One:  Sexual Intercourse or Sodomy ("Blanket Night").**

One night, when the victim was visiting defendant's home, he invited her to watch a movie in his bedroom.  During the movie, defendant and the victim were lying under a tiger blanket.  Defendant began to rub the victim's stomach, "private" area and "butt area."  He then removed her pants and underwear and "started to hurt [her]" by penetrating her vagina with his penis.  His penis, which felt "hard," was inside her for about five minutes.  Defendant then turned the victim over and placed his penis in her "bottom" or "butt hole."  "He kept like going really hard and then [took] it out."  About five minutes later, defendant removed his penis, got dressed, and went into the living room.  The victim, in turn, got dressed and laid on the bed for a while before joining defendant in the living room.

**B.     Count Two:  Sexual Intercourse or Sodomy ("Soccer Night").**

One day after soccer practice, defendant took the victim to his home and, about 20 minutes later, asked her to come into his bedroom.  Defendant then penetrated the victim's vagina with his penis.  The victim, wanting to see what was hurting her so badly, lifted the pillow that was covering her face.  She could see defendant standing on top of her, "and he pulled out his private, and, . . . in [her] head [she thought] 'Oh my gosh.' "  Although the incident was painful, there was "no goo on that day." Defendant redressed and went into the living room, where the victim joined him to watch television after pulling up "her pants and stuff."

**C.     Count Three:  Sexual Intercourse or Sodomy ("Pizza Night").**

On March 6, 2011, the victim was spending the afternoon playing with her Barbie dolls at defendant's home, when he asked that she join him in his bed.  Defendant then pulled down her pants and underwear and "started to hurt" her.  After touching her vagina, defendant pulled his pants down and "put his private" into her vagina.  She could not see his penis because he had covered her face with a pillow.  Next, defendant penetrated her "butt" with his penis, which was very painful because he would put his penis inside her anus "real hard deep and then take it out and then put it in real hard

4

deep." After defendant moved "it around inside" of her, she had "gooey stuff" on her bottom, which she wiped off with a tissue "because [she] wouldn't want that on me. And . . . it was just gooey."

**D.      Count Four:  Sexual Intercourse or Sodomy ("Shadow Night").**

One night, the victim was using a flashlight to make "shadow puppets" on the wall of defendant's bedroom.  Defendant, who was asleep, woke up and got on top of the victim.  According to the victim, after she removed her pajama bottoms and underwear, defendant "decided to hurt me again."  Defendant penetrated the victim's vagina with his penis, and then "pulled his pants up and stuff and he went back to bed."

**E.      Count Five:  Oral Copulation or Sexual Penetration.**

Finally, one day, when the victim was doing laundry in the basement of her San Leandro home, defendant confronted her and had her lean against him.  Defendant placed his arms around the victim from behind and used his fingers to touch her "private area, inside, inside and around and outside of it . . . ."  Although defendant used two fingers to touch the outside of her panties, she could feel only one finger inside her vagina.

**F.      The Uncharged Prior Acts of Sexual Abuse.**

R.G., an adult at the time of trial, met defendant when she was about five years old.  R.G.'s aunt was married to defendant at the time, and her grandmother would watch R.G. and defendant's children.  Once, R.G. was sleeping in a tent they had pitched in the living room of her aunt's house.  R.G. awoke to find defendant "on top of [her] trying to kiss [her]."  She could feel "[defendant's] erection rubbing on [her] leg."  She begged defendant to stop, but "all he could say is 'just kiss me.' "  She continued to protest, but defendant kissed her anyway.  R.G. did not call for help because there was no one there.

Another time, when R.G. was about ten or 11 years-old, defendant was driving her home in his van.  Defendant pulled over near a San Leandro park.  He then brought R.G. to sit on a bench seat in the back of the van, where he "went between [her] legs and asked [her] to kiss him again."  R.G. said, "no," and began to cry.  Defendant then told her: "If you give me a kiss, I'll stop."

5

R.G. did not tell anyone about these incidents at the time because she was afraid and because defendant asked her not to. However, after defendant was arrested in this case, she decided to come forward to report them. She acknowledged having a close relationship with the victim's mother (to wit, defendant's daughter).

## II.     The Defense Case.

Defendant, testifying in his own defense, denied improperly touching the victim or R.G. Defendant had known the victim to lie and recalled that she had expressed anger about his relationship with his girlfriend, Minh, who was age 51 or 52. The victim had also indicated her desire that he reconcile with D.E., the victim's grandmother. Defendant explained the presence of semen on the tissues tested by the crime laboratory by the fact that he had engaged in intercourse with Minh a few nights before the "pizza night," and the couple had used tissues to wipe themselves afterward.

## III.     The Verdict, Sentencing, and Appeal.

On July 8, 2014, the jury found defendant guilty of all counts, and found true that defendant had sustained a prior strike conviction. On October 24, 2014, the trial court granted defendant's motion to strike the prior conviction enhancement pursuant to section 1385 before sentencing him to a total term of 115 years to life in prison. Defendant filed a timely notice of appeal the same day.

### DISCUSSION

Defendant raises two constitutional arguments on appeal. First, defendant contends the trial court violated his due process rights by instructing the jury that it could consider evidence of his commission of two uncharged sexual crimes against R.G., a minor at the time, if those crimes were proved by the prosecution by a preponderance of the evidence. Second, defendant contends his sentence, 115 years to life in prison, violates the constitutional prohibition against cruel and unusual punishment, as well as procedural due process. We address each argument in turn.

6

**I. Jury Instruction on Evidence of Defendant's Prior Uncharged Sex Crimes.**

Defendant challenges as unconstitutional the instructions given to the jury regarding its consideration of the evidence of his commission of two prior uncharged sex crimes against R.G. The instructions, CALJIC Nos. 2.50.01 and 2.50.1, follow Evidence Code section 1108, the legal basis relied upon by the trial court to admit this so-called "propensity" evidence. Defendant reasons that CALJIC Nos. 2.50.01 and 2.50.1, as well as CALCRIM No. 1191, "dilute the prosecution's burden [of proof] and permit conviction based on a chain of reasoning that is fatally flawed because a direct link in the chain of evidence leading to a guilty finding [is] proved only by a lesser standard than reasonable doubt."[3]

As defendant acknowledges, the California Supreme Court has rejected a variety of constitutional challenges to Evidence Code section 1108, as embodied in CALJIC Nos. 2.50.01 and 2.50.1 and CALCRIM No. 1191. In doing so, the high court has authorized the jury's consideration of otherwise admissible evidence of a defendant's prior commission of an uncharged sex crime as tending to prove his or her propensity to commit sex crimes, so long as the prosecution has proved the uncharged sex crime by a preponderance of the evidence. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1014 ["Under CALJIC No. 2.50.01, *evidence* of the uncharged offense may support the *inference* that defendant had a disposition to commit the charged offense which, in turn, may support the *inference* that he was likely to commit and did commit the charged offense"]; accord *People v. Falsetta* (1999) 21 Cal.4th 903, 918.)

Defendant contends, however, this California Supreme Court authority does not address the precise issue raised here ─ to wit, "whether the state can use propensity evidence *at all* to prove that a defendant was likely to have committed the charged

---

[3]     The trial court in this case gave CALJIC Nos. 2.50.01 and 2.50.1, which are for all significant purposes comparable to CALCRIM No. 1191. The trial court also instructed the jury on the legal definitions of "beyond a reasonable doubt" and "preponderance of the evidence," and on the prosecution's burden to prove defendant guilty of each offense beyond a reasonable doubt.

offenses, unless the predicate facts ─ the uncharged offenses ─ are proved beyond a reasonable doubt." We disagree.

First, defendant disregards that in *People v. Reliford*, the California Supreme Court did address the burden of proof applicable to so-called "predicate fact[s]." Specifically, the high court considered – and then rejected – the defendant's comparable argument that CALJIC No. 2.50.01 was too "complicated" for jurors to follow because it asked jurors to apply the preponderance-of-the-evidence standard to the predicate fact of his commission of prior sex crimes, while asking them to apply the beyond-a-reasonable-doubt standard to other facts, explaining: "This is not the first time jurors have been asked to apply a different standard of proof to a predicate fact or finding in a criminal trial. (E.g., CALJIC Nos. 2.50 [evidence of other crimes under Evid. Code, § 1101], 4.43 [necessity defense], 4.60 [entrapment], 4.74 [statute of limitations], 6.24 [admissibility of coconspirator's statements], 7.73 [failure to file tax returns in prior years], 12.06 [lawful possession of controlled substance].) As we do in each of those circumstances, we will presume here that jurors can grasp their duty--as stated in the instructions--to apply the preponderance-of-the-evidence standard to the preliminary fact identified in the instruction and to apply the reasonable-doubt standard for all other determinations." (29 Cal.4th at p. 1016.)

Second, and even more to the point, the precise constitutional argument defendant raises, directed, as it were, at the evidentiary standard applicable to propensity evidence admitted under Evidence Code section 1108, was recently rejected by our colleagues in the Second Appellate District, Division Three. In *People v. Anderson* (2012) 208 Cal.App.4th 851, the defendant, like our defendant, argued the jury instruction given on use of propensity evidence diluted the People's burden of proof with respect to the charged sex crimes. The Court of Appeal disagreed, reasoning as follows: "The uncharged offense instruction given here was based on CALCRIM No. 1191. That instruction and a similar instruction, CALJIC No. 2.50.01, have been upheld against claims they unconstitutionally lower the prosecution's burden of proof. (See *People v. Reliford* (2003) 29 Cal.4th 1007, 1013-1014 [130 Cal.Rptr.2d 254, 62 P.3d 601]

8

[upholding CALJIC No. 2.50.01]; [citations].) [¶] In *People v. Reliford*, the prosecution presented evidence indicating the defendant previously had raped a different victim in a manner similar to the charged offense. The defendant claimed that, 'having found the uncharged sex offense true by a preponderance of the evidence, jurors would rely on "this alone" to convict him of the charged offenses.' (*People v. Reliford, supra*, 29 Cal.4th at p. 1013.) *Reliford* rejected the argument because the instruction specifically stated, ' "if you find by a preponderance of the evidence that the defendant committed a prior sexual offense . . . , that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crime." ' (*Ibid*.) *Reliford* found, 'No reasonable juror would believe those requirements could be satisfied solely by proof of uncharged offenses.' (*Id.* at pp. 1013-1014.) . . . [¶] "Here, as in *Reliford*, the instruction specified the uncharged offenses were not sufficient alone to prove the charged offenses and reminded the jury the People still had the burden to prove 'every element of every charge' beyond a reasonable doubt. Reviewing the instructions as a whole, and assuming jurors are capable of understanding and correlating jury instructions (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148-1149 [40 Cal.Rptr.3d 118, 129 P.3d 321]), there is no reasonable likelihood the instruction on uncharged offenses relieved the prosecution of its burden of proof with respect to the charged offenses. [¶] . . . "Finally, we reject Anderson's claim *Reliford* and the other cases cited above are distinguishable in that one of the instant uncharged offenses fell within the direct chain of proof of Anderson's guilt. (*People v. Tewksbury* [(1976)] 15 Cal.3d [953,] 965, fn. 12.) [¶] *People v. Tewksbury* discussed the degrees of burdens of proof which may be placed on a defendant in a criminal case. (*People v. Figueroa* (1986) 41 Cal.3d 714, 721 [224 Cal.Rptr. 719, 715 P.2d 680].) *People v. Tewksbury, supra*, 15 Cal.3d at page 964 held, generally, a defendant need only raise a reasonable doubt as to the existence or nonexistence of a fact in issue. However, when a defendant raises 'factual issues collateral to the question of the accused's guilt or innocence [that] do not bear directly on any link in the chain of proof of any element of the crime,' such as an entrapment defense or whether a witness is an accomplice, the Constitution is not offended by requiring the defendant to prove such facts by a

preponderance of the evidence. In footnote 12, cited by Anderson, *Tewksbury* stated: 'When the People bear the burden of proof of a fact deemed to lie outside the direct chain of proof of an accused's guilt of the crime charged, they are not required to prove that fact beyond a reasonable doubt.' (*People v. Tewksbury, supra*, at p. 965, fn. 12.) [¶] "From this, Anderson reasons a fact within the direct chain of proof of an accused's guilt must be proved beyond a reasonable doubt. *However, the uncharged offenses were not in the direct chain of proof as that term is used in Tewksbury. Rather, a defendant's propensity to commit a particular type of crime, here lewd act, is the type of collateral fact addressed in Tewksbury. Anderson's propensity to commit such crimes does not 'bear directly on any link in the chain of proof of any element of the crime.'* (*People v. Tewksbury, supra*, 15 Cal.3d at p. 964.)" (*People v. Anderson, supra*, 208 Cal.App.4th at pp. 896-897 [italics added].)

We agree with the reasoning set forth in *People v. Anderson*, and find it applies squarely to defendant's challenge herein.[4] As reflected in our colleagues' decision, the California Supreme Court has long recognized that facts relating to a defendant's prior commission of a sex crime do not serve as direct proof of the defendant's guilt in the present case. However, such facts may serve collaterally to support an inference that the defendant had a disposition to commit the charged offense which, in turn, may support the inference that he was likely to commit and did commit the charged offense. As such, the Constitution is not offended by requiring the People to prove such facts by a preponderance of the evidence where, as here, the jury is otherwise properly instructed regarding the People's burden to prove each element of the crime beyond a reasonable doubt. (*People v. Reliford, supra*, 29 Cal.3d at p. 1014; see also *People v Jandres* (2014) 226 Cal.App.4th 340, 359 ["Propensity was, of course, not an element of any of the charged crimes. And the instructions specified that the uncharged offense was not sufficient alone to prove the charged offenses and reminded the jury the People still had

---

**4**    Both the California and United States Supreme Courts declined to review this decision. (See *People v. Anderson* (Oct. 2012) S205103, review denied; *Anderson v. California* (2013) 133 S.Ct. 1738, 185 L.Ed.2d 788, cert. denied.)

the burden to prove each charge beyond a reasonable doubt. Accordingly, 'there is no reasonable likelihood the instruction on uncharged offenses relieved the prosecution of its burden of proof with respect to the charged offenses' "].) Accordingly, defendant's first constitutional challenge to this judgment fails.

## II.     Sentencing Defendant to 115 Years to Life in Prison.

Defendant, 58 years-old when convicted, also challenges his sentence as a violation of the Eighth Amendment's prohibition against cruel and unusual sentences, as made applicable to the states through the due process clause of the 14th Amendment. Specifically, defendant contends his 115 years-to-life sentence amounts to de facto sentence of life without the possibility of parole, which is unconstitutional under both federal and state law. We conclude, initially, that defendant has forfeited the right to appellate review of this contention by failing to contemporaneously object to his sentence on Eighth or 14th Amendment grounds in the trial court. (*People v. Gamache* (2010) 48 Cal.4th 347, 403; *People v. Mungia* (2008) 44 Cal.4th 1101, 1140-1141.) Moreover, we conclude that, even were we to disregard defendant's failure to raise a proper objection, his challenge would nonetheless fail on the merits. The applicable law is not in dispute.

"[A] punishment may violate the California constitutional prohibition [against cruel or unusual punishment] 'if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 478.) Similarly, the United States Supreme Court has made clear that the "Cruel and Unusual Punishment Clause of the Eighth Amendment is directed, in part, 'against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged.' [Citations.]"[5] (*Enmund v. Florida* (1982) 458 U.S. 782, 788.)

Courts generally apply a three-part test to determine whether a particular sentence goes astray of these constitutional limitations. "First, we examine the nature of the

---

[5]     California's constitutional prohibition is, thus, even broader than the federal prohibition against cruel and unusual punishment. (Cal. Const., Art. I, § 17 [prohibiting "[c]ruel or unusual punishment[s]"].)

offense and/or the offender, with particular regard to the degree of danger both present to society. A look at the nature of the offense includes a look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts. A look at the nature of the offender includes an inquiry into whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' (*People v. Dillon, supra*, 34 Cal. 3d 441, 479.) Next, we compare the challenged punishment with the punishment prescribed for more serious crimes in the same jurisdiction. And finally, the challenged punishment is compared with punishment for the same offense in other jurisdictions." (*People v. Thongvilay* (1998) 62 Cal.App.4th 71, 88.)

We conclude defendant's sentence is constitutionally permissible under this three-prong test. First, the nature of defendant and his offenses indeed reflect he is a grave danger to society. Not only did he commit numerous, serious sex crimes, he did so against his quite-young granddaughter, who was entrusted to his care by his own daughter and who loved and respected him tremendously (which sentiments defendant, in turn, exploited in his favor). Indeed, defendant secured his granddaughter's silence by telling her that, if she told anyone, her mother would fall gravely ill and that she would never see him again. Moreover, defendant has steadfastly denied guilt, expressing no remorse whatsoever for his actions, while his granddaughter, in turn, has continued to suffer, attempting suicide and requiring hospitalization for psychiatric treatment. Finally, we hasten to add this is not defendant's first brush with the law. Rather, he has previously committed an offense serious enough to qualify as "Strike" within the meaning of section 1170.12, as well as the two prior sex crimes against another young girl, R.G., who was similarly entrusted to his care by a family member.

Second, comparison of defendant's sentence to those imposed for more serious crimes in this jurisdiction indicates his sentence is within the realm of acceptable punishment. (See, e.g., *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230 [8th Amendment challenge rejected where defendant received a 135 years to life sentence for

12

16 sex offenses against four minors]; *People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [8th Amendment challenge rejected where defendant received a 283 year, eight month sentence for 46 sex offenses against seven women on four separate occasions].)

Defendant's suggestion that the mere fact his sentence will not be complete within his lifetime renders it per se unconstitutional is not consistent with California law. (See *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1382-1383 [acknowledging, yet disagreeing with (and noting the lack of precedential value of), Justice Mosk's concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, 600-601, in which he concluded that a 111-year sentence was " 'impossible for a human being to serve, and therefore violates both the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and the cruel or unusual punishment clause of article I, section 17 of the California Constitution' "].) Nor do we accept defendant's due process argument that his sentence amounts to "an end run around the procedural and substantive requirements of section 190.2." Section 190.2, which requires a unanimous jury finding of one or more delineated special circumstances before imposition of a sentence of life without the possibility of parole for first degree murder, is simply inapposite. Defendant was convicted of committing five serious sex crimes against a minor on five separate occasions; he was not convicted of one count of first-degree murder, the only offense triggering the special-circumstance requirements of section 190.2.

In any event, even accepting defendant's claim that, with no realistic chance of parole, he will spend the remainder of his life in prison, the fact remains that our legislature has implicitly endorsed such long sentences in sex crime cases by enacting section 667.6. As summarized in *People v. Huber* (1986) 181 Cal.App.3d 601, 634-635, a case involving a 106-year sentence for multiple counts of forcible rape, forcible oral copulation, penetration by foreign object, robbery and burglary: "Justice Reynoso, writing for the majority in *People v. Karsai* (1982) 131 Cal.App.3d 224 [182 Cal.Rptr. 406], answers the contention aptly: 'In enacting Penal Code Section 667.6 the Legislature has chosen to treat violent sex offenses and violent sex offenders in a manner different than other types of offenses and offenders. . . . The statute is directed at

13

multiplicity of offenses by providing for full, separate, consecutive sentencing. In view of the outrageous nature of violent sexual offenses and the manifest danger to society from recidivism and multiplicity of offenses, we cannot say that the severity of punishment is so disproportionate to the crimes so as to shock the conscience and offend fundamental notions of human dignity.' (*Id*., at p. 242 [26-year sentence for rape and oral copulation, enhanced by two prior sexual convictions not disproportionate]; accord *People v. Bestelmeyer* [(1985)] 166 Cal.App.3d 520 [129 years for 25 separate offenses not disproportionate].)"[6]

Returning to our case, as in *People v. Huber*, defendant committed a multitude of serious sexual offenses on five separate occasions against his nine year-old granddaughter. Given this record and in light of this statutory law, we cannot conclude defendant's lengthy sentence offends California law.

Finally, the third prong of the applicable standard requires comparison of defendant's sentence to those imposed for comparable crimes in other jurisdictions. (*In re Lynch* (1972) 8 Cal.3d 410, 427-429.) Defendant has directed us to no non-California case casting doubt on the constitutionality of his sentence. The People, in turn, have identified several cases suggesting the propriety of his sentence. (E.g., *Edwards v. Butler* (5th Cir. 1989) 882 F.2d 160, 167 [rejecting 8th Amendment challenge to sentence of life without possibility of parole for one count of aggravated rape]; *Land v. Commonwealth* (Ky. 1999) 986 S.W.2d 440, 441 [rejecting 8th Amendment challenge to sentence of life without possibility of parole for each of two counts of rape]; *Gibson v. State* (Fla. 1998) 721 So.2d 363, 369-370 [rejecting 8th Amendment challenge to sentence of life without possibility of parole for 23-year-old convicted of capital sexual battery and lewd and lascivious acts on an 8-year-old]; *State v. Foley* (La. 1984) 456 So.2d 979, 984 [rejecting 8th Amendment challenge to sentence of life without possibility of parole for juvenile convicted of one count of aggravated rape].) Given this unchallenged sampling of

---

[6]     *People v. Karsai, supra,* 131 Cal.App.3d at pp. 233-234, was disapproved on another ground in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.

comparable non-California decisions, we conclude the third prong has been satisfied in this case.

Accordingly, having met the applicable three-prong standard for assessing challenges under the Eighth Amendment of the United States Constitution, and Article I, section 17 of the California Constitution, the judgment and sentence against defendant stands.

## DISPOSITION

The judgment is affirmed.

_____

Jenkins, J.

We concur:

_____

Pollak, Acting P. J.

_____

Siggins, J.

*People v. Arthur Esver*, A143397

15